## Pennsylvania Human Relations
## Commission v. Altman

*Charles B. Zwally* and *Edward F. Cantlin,* for appellants.

*Nathan Agran,* for Commonwealth.

HERMAN, J., March 30, 1967.—We have for consideration the appeal of Ronald Altman, David Dolgenos and Norman Feinberg, individually and doing business as Gateside-Bryn Mawr Company, from the decision and final order of the Pennsylvania Human Relations Commission, in which the commission found that appellants had committed unlawful discriminatory practices in violation of section 5(h) of the Pennsylvania Human Relations Act of October 27, 1955, P. L. 744, as amended, 43 PS §955(h), in that they had refused to rent commercial housing in the Broadlawn Apartments to Kenneth D. Hill and his wife because of their race, they being Negroes. The final order then called for certain affirmative action.[1]

The Pennsylvania Human Relations Act, under which the commission acted in this matter, provides in section 10, 43 PS §960, for a review of the commission's determination under the provisions of the Administrative Agency Law of June 4, 1945, P. L. 1388, as amended, 71 PS §1710.1. Such appeal comes to this court.

While section 9 of the Pennsylvania Human Relations Act, 43 PS §959, relieves the commission in a proceeding before it of complying with the strict rules of evidence prevailing in courts of law or equity, it is not thereby relieved from the necessity of basing its findings of fact on credible relevant evidence of a substantial nature.

The cases uniformly hold that the findings of fact on which an administrative agency, such as the Pennsylvania Human Relations Commission, bases its orders must be supported by "substantial evidence". They must be supported by such relevant evidence as a

---

[1] Appellants were directed, inter alia, to cease and desist withholding from complainants or others because of race, religious creed, etc., housing accommodations; and to forthwith rent an apartment to complainants.

reasonable mind might accept as adequate to support a conclusion. A mere scintilla of evidence or a suspicion of the existence of the fact to be established, no matter how well founded, is not sufficient: Consolidated Edison Co. v. National Labor Relations Board, 305 U. S. 197 (1938) ; Pennsylvania State Board of Medical Education and Licensure v. Schireson, 360 Pa. 129 (1948) ; Shenandoah Suburban Bus Lines, Inc., Case, 355 Pa. 521 (1947) ; Pennsylvania Labor Relations Board v. Kaufmann Department Stores, Inc., 345 Pa. 398 (1942) ; Ruettger v. Pennsylvania Public Utility Commission, 164 Pa. Superior Ct. 388 (1949) ; Matylewicz v. Hudson Coal Co., 53 Lack. Jur. 9 (1951) ; McPherson v. Connellsville Joint School Board, 32 D. & C. 2d 706, 81 Dauph. 298 (1963) ; Sanitary Water Board v. Coudersport Borough, 81 Dauph. 178 (1963) ; Penna. Real Estate Commission ex rel. v. Radnor Real Estate, Inc., 75 Dauph. 180 (1960).

In arriving at its decision and final order, the commission relied on 18 findings of fact, from which 7 conclusions of law were drawn. There is no dispute concerning the first 7, nor the 12th, 13th, 14th, or 16th findings of fact, and from these admitted findings we can summarize as follows:

Kenneth D. Hill and Castella I. Hill, his wife, Negroes, in response to newspaper advertisements, applied, on Sunday, May 8, 1966, to Broadlawn Apartments, Bryn Mawr, Delaware County, to rent a two bedroom apartment for themselves and their three-year-old daughter. The Hills were accompanied to the Broadlawn by one William Pepper, Jr., a white member of the Fair Housing Committee of Radnor Township. The Broadlawn Apartments is a complex consisting of 300 apartments in which, at the time of the hearing, there were no Negro tenants, although one Korean couple had resided there for two years. On the same Sunday that the Hills applied for an apart-

ment, and about one half hour before their arrival, one Mary R. Holbrow, a white woman, member of the Fair Housing Committee of Radnor Township, representing that she desired to rent the same type of two bedroom apartment for which the Hills later applied, appeared at the Broadlawn office and was told that there would be such an apartment available on May 15, 1966; another on June 1, 1966; and a third on July 15, 1966. Mrs. Holbrow, on the pretext that she wanted to first discuss the matter with her husband, left the apartment office just minutes before the arrival of the Hills. She returned the following morning, filled out and signed an application for rental of the apartment available on May 15, 1966, and gave her check for $145 as a deposit.

The Hills alleged in their complaint, filed May 9, 1966, *the day after* they had gone to the Broadlawn to seek an apartment, that respondents *"refused* to lease a two-bedroom apartment" to them because of their race. At the hearing on this matter, both the Hills and Pepper, the white escort, testified that Mrs. Hayward, the part time employe of Broadlawn, who was the only person on duty on weekends, advised them that there were no two bedroom apartments available at that time and that there would be none in the near future; although, as we saw from the admitted facts Mrs. Holbrow, a white woman, had been told minutes earlier that there were such apartments available. Hill testified further, however, that Mrs. Hayward showed them a model kitchen and a model bath that would be installed in the type of apartment they sought; took them to a second floor two bedroom apartment similar to the type they wanted, and then accepted the application he filled out and signed. When he offered to leave a deposit Mrs. Hayward would have accepted it but after he was told that it would not assure him an apartment or put him in a good position on a waiting

list he then withdrew the offer. Mrs. Hayward did not reject the application, but retained it. Hill testified that he understood that his application would be considered just the same as if he had left a deposit. He admitted that he had never been told that his application was rejected. Nevertheless, believing that Mrs. Holbrow, on Monday, May 9th, had been rented the same type apartment that they sought, the Hills immediately filed their complaint alleging discrimination.

Mrs. Hill testified that although she had never had any difficulty with Broadlawn nor ever heard of any discrimination there, she, nevertheless, sought the help of the Radnor Township Fair Housing Committee (Delaware County) before going to the apartment house. Pepper was supplied by the Fair Housing Committee as an escort and he, in turn, secured the services of Mrs. Holbrow as a "tester". Mrs. Hill further testified that Mrs. Hayward "showed us the type of apartment that we would get if we were accepted in the apartment building" and, although she told them there were no two bedroom apartments available then nor in the near future, she, nevertheless, gave them an application to fill out, which after completion, she accepted.

Mary Holbrow testified that by prearrangement with the Hills and Pepper, she agreed to act as a "tester" and to go to the Broadlawn Apartments shortly ahead of the Hills, to misrepresent the facts by saying that she wanted to rent a two bedroom apartment on the ground floor when, in fact, she wanted no apartment at all—living in a home she and her husband owned; to say that she had one child, when in fact she had 5; and if necessary, to say that she and her husband had found ownership of a home too expensive and that they had sold their home and thus had to vacate it. Mrs. Holbrow testified that upon arrival at the apart-

ment house, she was, like the Hills, cordially treated by Mrs. Hayward, and also, like the Hills, was shown a sample bath and kitchen of the kind that would be in the apartment she could expect. Like the Hills, she too was shown a similar type apartment on the second floor (because no first floor apartment was then available). Mrs. Holbrow testified that she was then told by Mrs. Hayward that there would be available, on May 15th, a two bedroom apartment on the ground floor; on June 1st, one on the second floor; and on July 15th, still another first floor two bedroom apartment. Again misrepresenting the facts, Mrs. Holbrow told Mrs. Hayward that she would not then sign an application nor leave a deposit; but would go home to talk it over with her husband and they would think about it. Upon her return the next day, a Mrs. McCoy, and not Mrs. Hayward, was on duty (and a Mr. Wachs was there also). Without again going into the fact that she had one child and, therefore, desired an apartment in the section reserved for families with children, she signed an application and left a check, as we have previously indicated. It was her further uncorroborated testimony that the apartment she was to receive was 207C or D, neither of which was located in the section reserved for families with children. She testified that she believed she was conditionally accepted for that particular apartment.

We have carefully gleaned all of the testimony of all of the witnesses, and we conclude that this is the full extent of all of it from which the commission could find any discrimination, and while certainly these facts might raise a *suspicion* that the Hills were discriminated against because of their color, this is not sufficient.

The commission might have and probably did disbelieve Mrs. Hayward when she attempted to explain why she told Mrs. Holbrow there were apartments

available and then immediately thereafter told the Hills there were none. She testified that she had been in error when she told Mrs. Holbrow of the three available apartments, for they were *unavailable* for families with children; and she further testified that she lied to the Hills[2] because she became suspicious of the intentions of the Hills, who appeared with an unidentified white man who "seemed to be sort of in charge, so to speak".

The commission can scarcely disbelieve Mrs. Hayward's testimony relevant to her personal feelings concerning the Hills when, after she was asked whether it was not because these people were Negroes that she had lied, she replied: "No, it was not because—I would live next door to the Hills right now, and I live in the Broadlawn Apartments", and Chairman Simmons' remarks: "I think we should fully understand that Mrs. Hayward, from what she has said, has no personal prejudice, is that correct?" and Mrs. Hayward answered, "It most certainly is".

The commission must have disbelieved the testimony of Wachs, the property manager, when he said that the children's sections were designated 105 and 201, and that neither at the time the Hills and Mrs. Holbrow applied for apartments nor at the time of the hearing were any apartments available in those sections; that even though Mrs. Holbrow had *applied* for an apartment and left a deposit, she was not *rented* an apartment because she withdrew her application and stopped payment on the check before her application was checked; and that if her application or check called for an apartment in section 207, the application

---

[2] If we are to believe the testimony of Albert A. Wachs, the property manager of Broadlawn, that there were no apartments available in the section devoted to families with children, then Mrs. Hayward only *believed* she was lying to the Hills.

would have been rejected, for it disclosed that she purportedly had one child, and section 207 was not in the children's section.

At best, the evidence tending to show discrimination boils down to this: A white woman appeared alone at the Broadlawn Apartments on a Sunday when a part time clerk was the only person on duty, and, representing that she was married and had one child, was shown an apartment and told that there were, or would be in the near future, three apartments available. Immediately thereafter, a Negro couple, also having one child, accompanied by a white man, was told that there were no apartments available and that there would be none in the near future, but nevertheless, were given an application blank which was filled out and accepted. Thereafter, the white woman returned and made application for an apartment, and her application and check as a deposit were accepted. Neither of the parties was ever accepted as tenants, but neither was rejected prior to this action being brought.

We fully recognize that we cannot substitute our judgment for that of the commission: Eways v. Reading Parking Authority, 385 Pa. 592 (1956); Blumenschein v. Pittsburgh Housing Authority, 379 Pa. 566 (1954); Pennsylvania Insurance Department v. Philadelphia, 196 Pa. Superior Ct. 221 (1961); nor can we weigh the evidence: Pennsylvania State Board of Medical Education and Licensure v. Ferry, 63 Dauph. 243 (1952), aff'd, 172 Pa. Superior Ct. 372 (1953); nor pass on the credibility of witnesses: State Real Estate Commission v. Harris, 70 Dauph. 254 (1957). But on the other hand, we also recognize that administrative discretion must be subject to judicial scrutiny or it will no longer be discretion, but tyranny: 425-429, Inc. Liquor License Case, 179 Pa. Superior Ct. 235 (1955); Hotchkiss Liquor License Case, 169 Pa. Superior Ct. 506 (1951).

The Administrative Agency Law, supra, in section 44, 71 PS §1710.44, provides:

"The court to which the appeal is taken shall hear the appeal without a jury on the record certified by the agency. After hearing, the court shall affirm the adjudication unless it shall find . . . that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence".

The "substantial evidence" referred to in the above quoted statute is well defined in Pennsylvania State Board of Medical Education and Licensure v. Schireson, supra, which quotes from the opinion by Mr. Justice Horace Stern (later Chief Justice) in Pennsylvania Labor Relations Board v. Kaufmann Department Stores, Inc., supra, at 400-01:

"All orders and decress of legal tribunals, including those of administrative boards and commissions, must be supported by evidence sufficient to convince a reasonable mind to a fair degree of certainty; otherwise our vaunted system of justice would rest upon nothing higher than arbitrary edicts of its administrators. 'Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion': Consolidated Edison Co. v. National Labor Relations Board, 305 U. S. 197, 229. 'Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established': National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U. S. 292, 300. 'The rule of substantial evidence is one of fundamental importance and is the dividing line between law and arbitrary power': National Labor Relations Board v. Thompson Products, Inc., 97 Fed. 2d 13, 15; National Labor Relations Board v. Union Pacific Stages, Inc., 99 Fed. 2d 153, 177".

In Union Trust Company of Pittsburgh's Petition, 342 Pa. 456, 464 (1941), it is aptly stated: "Suspicion may have its place, but certainly it cannot be substituted for evidence". This was repeated with approval in Pennsylvania Labor Relations Board v. Kaufmann Department Stores, Inc., supra.

See McKinley Park Homes v. Commission on Civil Rights, 20 Conn. Sup. 169, 129 A. 2d 235 (1956), where the Connecticut Superior Court found only suspicion and not evidence which is "substantial and competent" as required by Connecticut law. In that case, complainant was suspicious because the girl in the office of the apartment house where he sought an apartment told him she had no application forms and that there were no vacancies, when he had seen her prepare an application on a form for a previous applicant. He was further suspicious when the office girl typed a facsimile for him and accepted it after he had completed it. Complainant filed his complaint *one week later*, and much of the evidence concerned events occurring after the filing of the complaint. The court pointed out that one week appeared to be a "short space of time" to expect action. In the instant case, it will be remembered the complaint was filed the *day following the application*.

The commission's findings of fact nos. 9, 10, and 11 [3]

---

[3] "9. On May 8, 1966, the said Kay Hayward, respondents' agent as aforesaid, advised complainants there were no two-bedroom apartments available for rent by complainants at that time or in the immediate future in the said Broadlawn Apartments.

"10. Such representations made to complainants by respondents, acting through their duly authorized agent, were false and untrue, there being, in fact, two-bedroom apartments available for rent immediately and in the near future, particularly on May 15, 1966, on June 1, 1966 and on July 15, 1966.

"11. Such false statements were made to the complainants on May 8, 1966 because the complainants are Negroes and because the respondents, acting through their said agent as aforesaid, did not

are necessary to support its adjudication, and we are unable to find the substantial credible evidence required to support them.

We are strengthened in our conclusion by the complete lack of any positive affirmative testimony of discrimination practiced at any time at the Broadlawn, by the admitted fact that a Korean couple has lived there for several years without any apparent difficulties and, further, by the emphatic, positive testimony of Norman M. Feinberg, one of the owners of the apartment complex. Chairman Simmons asked the question:

"Q. Mr. Feinberg, we would like to know what your policy is in regard to development; secondly, whether or not you would be willing to give this fine, young couple an opportunity to live in your apartment at the first feasible opportunity?

"A. Let me say insofar as policy is concerned, there has never been a policy of discrimination at Broadlawn. To my knowledge, anyone who has ever qualified has been accepted, and I might add as well, that policy will continue.

"You had asked the question before, I believe, of me that you wanted a statement that said you wanted my assurance or our assurance that any qualified Negro couple could come into Broadlawn. Well, I give you that. Without any qualifications, other than the normal standards that we apply to everyone.

"Now, to the second issue as to whether the Hills can come into Broadlawn, the answer is no, and the answer is no very simply, had I known, for example that the Korean couple had been accompanied by someone else for this kind of a purpose, I would have rejected them as well. I feel very strongly about this kind of a thing. Had the Hills come by themeselves, I think they

desire to rent an apartment to the complainants because of the complainants' race".

would have been tenants in Broadlawn, certainly, by the fall, but I absolutely feel we have enough problems in terms of qualifying people and determining people who they are and what they are, and even after we look over applications and inspect them, one thing and another, we still find from time to time we have to reject for one reason or another. I don't think that something is covered with fraud, as far as I'm concerned, is a reason for me to have to accept someone.

"Q. Well, let me—

"A. (Interposing) You have to understand that I have a property here worth several million dollars there are people involved who are investors, tenants. I have a responsibility that is very broad.

"Somebody comes in, accompanys someone for a specific purpose, their action, no doubt, they think is worthwhile. Nevertheless, from my point of view, to have taken certain actions which I think we clearly showed are misleading, represented by lies and so on, are just final reasons, from my point of view, for turning down this particular couple.

"I have never seen this couple before, and I again state to you, from what I have seen of them here today, had they come in of their own accord, I think they would have been in Broadlawn by the fall. I am applying a standard, not only to the Hills, but to everyone, everyone accompanied, anybody accompanied by someone for whatever purpose.

"I have to look at it as maybe they are people who are troublemakers, inciters. As I say, there are enough difficulties in the management of a property that I do not have to accept these people".

And at n.t. 193:

"Mr. Feinberg—

"[Y]ou have my assurance that the first couple, first Negro couple qualifying for tenancy, at the Broadlawn, will certainly get an apartment, and that quali-

fication will be—those qualifications apply to all people, regardless of any race.

"I don't know how many different races we have at Broadlawn, I have never looked at it myself".

We have carefully reviewed all of the testimony and, as we view it, if the commission believed all of the evidence tending to point to discrimination and disbelieved all of the evidence refuting it, there would still be no more than a suspicion or at best a scintilla of evidence on which the disputed findings of fact could be based and this is insufficient under the law. See McPherson v. Connellsville Joint School Board, 32 D. & C. 2d 706, 81 Dauph. 298 (1963).

For the reasons we have herein set forth, we enter the following

ORDER

And now, March 30, 1967, the appeal of Ronald Altman, David Dolgenos and Norman Feinberg, individually and doing business as Gateside-Bryn Mawr Company, from the decision and final order of the Pennsylvania Human Relations Commission entered June 28, 1964, is sustained and said decision and final order are set aside.