Pittsburgh Press Employment Advertising Discrimination Appeal.

450

Argued October 20, 1971, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MANDERINO, MENCER and ROGERS. Judge MANDERINO did not participate in the decision.

*Charles Weiss*, with him *Charles R. Volk, Michael Yukevich, Jr.*, and *Thorp, Reed & Armstrong*, for appellant.

*Marion K. Finkelhor*, Assistant City Solicitor, with him *Ralph Lynch, Jr.*, City Solicitor, for appellee, City of Pittsburgh.

*S. Asher Winikoff*, for additional party, The National Organization For Women, Inc.

*W. Frank Stickle, Jr.*, with him *Arthur B. Hanson* and *Ralph N. Albright, Jr.*, for amicus curiae, The American Newspapers Publishers Association.

OPINION BY JUDGE KRAMER, January 27, 1972:

This is an appeal from an Order of the Court of Common Pleas of Allegheny County, dated March 24, 1971, affirming an Order of the Pittsburgh Commission on Human Relations (Commission), appellee, dated July 23, 1970. This Order found the Pittsburgh Press Company (Pittsburgh Press), appellant, to be in violation of the Human Relations Ordinance of the City of Pittsburgh and ordered the utilization of a "classification system of employment advertisement with no reference to sex."

This case was commenced on October 9, 1969, when the National Organization for Women (N.O.W.) filed a complaint with the Commission charging the Pittsburgh Press with "deliberate and constant violations" of Section 8(j) of Ordinance No. 75, enacted into law by the Council of the City of Pittsburgh on February 27, 1967, and as amended by Ordinance No. 395,* approved July 8, 1969. After a conference with the parties, the Commission, on November 3, 1969, found that "probable cause" existed to support the filing of the complaint, and a public hearing was directed to be held. On January 6, 1970, the Pittsburgh Press filed its answer to the complaint, and hearings were held before the Commission on four days during January and February of 1970.

The Human Relations Ordinance has been been upheld as a valid enactment of the City of Pittsburgh within the authority confered upon the City by the Act of March 7, 1901, P. L. 20, Article XIX, Section 3, Clause XLIII, 53 P.S. 23158. See *City of Pittsburgh v. Plumbers' Local Union No. 27*, 113 P.L.J. 7 (1965); *Stanton Land Company, et al. v. City of Pittsburgh,*

---

* This amendment added the word "sex" to the list of protected classes.

111 P.L.J. 469 (1963). Also *see* Act of October 27, 1955, P. L. 744, Section 12.1, as amended, 43 P.S. §962.1.

The "particular" of the complaint of N.O.W. reads as follows: "The National Organization for Women charges the Pittsburgh Press with deliberate and contant violations of Section 8(j) of the Human Relations Ordinance as amended by Ordinance 395. The National Organization for Women has attempted on several occasions to convince editors and publishers of the Pittsburgh Press that their policy of allowing employers to place advertisements in male or female columns, when the jobs advertised obviously do not have bona fide occupational qualifications or exceptions, is unlawful."

The pertinent provisions of Section 8(j) of the amended ordinance read as follows:

"It shall be an unlawful employment practice . . . except where based upon a bona fide occupational exemption certified by the Commission in accordance with Section 7, subsection (d) of this ordinance: . . .

"(j) for any person, whether or not an employer, employment agency or labor organization, *to aid,* incite, compel, coerce or participate in the doing of any act declared to be an unlawful employment practice by this ordinance, or to obstruct or prevent any person from enforcing or complying with the provisions of this ordinance, or any rule, regulation or order of the Commission, or to attempt directly or indirectly to commit any act declared by this ordinance to be an unlawful employment practice." (Emphasis added.)

Section 8(e) of the amended ordinance declares it to be an unlawful employment practice: "(e) For any employer, employment agency, or labor organization to publish or circulate, or to cause to be published or circulated, any notice or advertisement relating to employment or membership which indicates any discrimina-

tion because of race, color, religion, ancestry, national origin or place of birth, or sex."

Section 7(d), mentioned in Section 8(j) above, reads:

"The Commission shall have the power and it shall be its duty to:

"(d) Certify upon the request of any person that a particular occupation or position is exempt from the provisions of this ordinance relating to unlawful employment practices if the Commission finds that the occupation or position reasonably requires the employment of a person or persons of a particular race, color, religion, ancestry, national origin or place of birth, or sex and that such certification is not sought as means of circumventing the spirit and purpose of this ordinance, the burden of proving the facts required for such a finding to be in each instance upon the person requesting the certification of exemption from the provisions of this ordinance."

We should also point out that under definitions in Section 4 of the Ordinance, we find: "(b) Discriminate and discrimination—The terms 'discriminate' and 'discrimination' include any difference in treatment based on race, color, religion, ancestry, national origin, place of birth, or sex."

The record in this case clearly shows that the Pittsburgh Press has attempted to eliminate discriminatory employment advertising on the basis of sex and thereby achieve the goals of the Ordinance. Illustrative of this attempt are references in the record to changes already made in its advertising column headings and efforts to eliminate the terms "male" and "female" in the body of employment advertising ads. These changes were effected through negotiation and conference with the Commission. The record indicates an intent and desire on the part of the Pittsburgh Press to cooperate with the

Commission in eliminating discriminatory wording in employment advertising. This certainly is commendable and to be expected of the Pittsburgh Press in light of its role as one of the nation's leading civil rights advocates in both word and deed.

The complaint of N.O.W., and this opinion, are restricted to alleged discrimination found in employment advertising column headings. The specific wording of the employment advertising column headings which are at issue in this case are three, namely, "Jobs-Female Interest," "Jobs-Male Interest" and "Male-Female Help."

In view of the fact that the court below did not take any additional testimony or receive any additional evidence, the scope of review of this Court is to determine whether or not the Commission abused its discretion or committed an error of law. *Gabriele v. Boeing Co., Vertol Division,* 1 Pa. Commonwealth Ct. 96, 99, 272 A. 2d 527, 529 (1971); *Romain v. Middletown Area School District,* 1 Pa. Commonwealth Ct. 419, 421, 275 A. 2d 400 (1971).

It should be pointed out that the record also indicates that the Pittsburgh Press publishes, what was termed in the record as, a "disclaimer" at the beginning of the male and female interest want ads, which reads as follows: "Notice to job seekers. Jobs are arranged under male and female classifications for the convenience of our readers. This is done because most jobs generally appeal more to persons of one sex than the other. Various laws and ordinances—local, state and federal, prohibit discrimination in employment because of sex, unless sex is a bona fide occupational requirement. Unless the advertisement itself specifies one sex or the other, job seekers should assume that the advertiser will consider applicants of either sex in compliance with the laws against discrimination."

In its "Decision and Order" the Commission made ten findings of fact which, upon our review of the record, are supported by substantial evidence. The Commission and the court below concluded that in its employment advertising the Pittsburgh Press was aiding employers in discriminating against women through the use of the above-noted column headings, and therefore was engaged in an unlawful employment practice violative of Section 8(j) of the Ordinance.

The lower court, in a lengthy opinion, affirmed the findings of fact and conclusions of law made by the Commission and directed the Pittsburgh Press to comply with the Commission order on or before May 10, 1971. An appeal was taken to this Court, and we granted the prayer of a petition for a supersedeas, *pendente lite*. The court below was aided by the participation of a number of amici curiae who filed briefs, two of whom were permitted by this Court to intervene. Briefs were submitted by the Solicitor of the City of Pittsburgh, on behalf of N.O.W. in support of the Commission's Order, and by the American Newspaper Publishers Association (ANPA) in support of the position of the Pittsburgh Press.

The Pittsburgh Press in its brief raises three issues which we will cover in the following sequence, First, the Pittsburgh Press states that the Commission violated its constitutional rights to due process of law by issuing an adverse order based upon a record devoid of any identified, alleged or proven principal offense. Secondly, the Pittsburgh Press argues that its use of the employment advertisement column headings in question does not constitute discrimination as prohibited by the Ordinance. Lastly, the Pittsburgh Press argues that the scope of the order of the Commission as affirmed by the court below exceeds the scope of the Commission's authority and jurisdiction and that it is too broad in pro-

scribing all reference to male and female, in that the Ordinance itself allows certain exemptions.

## DUE PROCESS

The Pittsburgh Press argues that failure on the part of N.O.W. to specifically allege, prove or identify the principal offense of discrimination renders the Commission's Order invalid in that due process of law was not afforded to the Pittsburgh Press.

The Pittsburgh Press is correct in its assertion that due process of law is as equally applicable to administrative proceedings as it is to judicial proceedings. In *W. J. Dillner Transfer Co. v. Pennsylvania P.U.C.,* at 175 Pa. Superior Ct. 461, 468-69, 107 A. 2d 159, 163 (1954), our Superior Court said: "Appellant argues it was not sufficiently apprised of the issue in that the complaint set forth and charged a violation of appellant's authority at Folder 3 of A. 61744, whereas the Commission based its finding on violation particularly on an interpretation of authority granted at Folder 2 of A. 61744. Admittedly, the requirement of procedural due process applies to proceedings before administrative tribunals as well as judicial bodies. The question of what constitutes a specific designation of the issue raised or charges made depends upon the violation alleged and the type of investigation being conducted. Armour Transportation Company v. Pennsylvania P.U.C., 138 Pa. Super. 243, 10 A. 2d 86; . . . ."

In the *Armour* case, *supra,* the court at 249 cited its earlier opinion in *National Automobile Corp. v. Barfod,* 289 Pa. 307, 311, 137 A. 601, 602 (1927) : "The requirement of due process of law, however, applies to administrative as well as to judicial proceedings. The doctrine of notice and hearing thus becomes a more potent force in our land, because it applies to the deci-

sions and acts of administrative officials and, unless there are extraordinary emergencies, this essential requisite of due process cannot be dispensed with." The *Armour* court also said at 250-51: "There must be due notice and an opportunity to be heard, the procedure must be consistent with the essentials of a fair trial, and the commission must act upon evidence and not arbitrarily. . . . Railroad Commission v. Pacific Gas & Electric Co., 302 U.S. 388, 393, 82 L. Ed. 319. The question of what is proper notice, or, as here, of what constitutes a specific designation of the issue raised or charges made, depends necessarily upon the facts of each case, the type of investigation being conducted, the violations alleged, and the penalty or order sought to be imposed. Where the purpose of the investigation by the Commission is only to determine the reasonableness of rates charged by utility, a different standard would seem to apply than where the franchise of the utility is sought to be revoked for violation of the utility laws and a penalty or fine imposed."

The ingredients of due process have been discussed in a multitude of judicial opinions. A reading of many of these cases confirms our understanding that due process of law is afforded when (1) the "accused" is informed with reasonable certainty of the nature of the accusation lodged against him, (2) he has timely notice and opportunity to answer these charges and to defend against attempted proof of such accusation, and (3) the proceedings are conducted in a fair and impartial manner. The Pittsburgh Press does not contend that it was denied an opportunity to defend itself or that it was denied an impartial and fair hearing. The Pittsburgh Press does insist, however, that it was denied due process of law insofar as being unable to determine from the complaint the nature of the alleged offense. In *Commonwealth v. Acquaviva, et al.,* 187 Pa.

Superior Ct. 550, 145 A. 2d 407, 410 (1958), the Superior Court adopted the lower court opinion of Judge LAUB in which he stated: "It is sufficient if the language used is capable of an interpretation which reveals such essentials. Lack of precision is not itself offensive to the requirement of due process. The constitution does not require impossible standards; all that is required is that the language convey sufficient definite warning as to the prescribed conduct when measured by common understanding and practices. Roth v. United States, 354 U.S. 476, 77 S. Ct. 1304, 1312, 1 L. Ed. 2d 1498." Although this was a criminal case, the principle is applicable here.

This is an administrative proceeding and is not restricted by the niceties of common law pleadings. The Pennsylvania Legislature in its wisdom permitted the establishment of local administrative agencies to process complaints and hold proceedings to adjudicate issues concerning certain rights of citizens. It certainly was within the contemplation of the Legislature that such a local administrative agency would be lay-oriented. It was contemplated, and is indeed the reality, that persons not formally trained in the law often serve as human relations commissioners. Similarly, it was to be expected that the complaints and charges would be framed in the language of laymen. Administrative agency proceedings have never been held to the high standards of the lawsuit filed in a court of law. In *Kochinsky v. Independent Pier Company,* at 157 Pa. Superior Ct. 15, 41 A. 2d 409, 410-11 (1945), the court said: "Proceedings before the compensation authorities are not 'litigation', and the strict rules of pleading and practice applicable to common law actions do not apply. The courts take a liberal attitude toward the pleadings in compensation cases and consider the substance of the relief prayed for rather than its form. . . . Of course, the

parties are entitled to know the issue in any particular proceeding, so that they may be prepared to meet it by proper evidence." A determination by this Court that the Pittsburgh Press had sufficient knowledge of the charges against it, thus enabling it to properly defend, would be dispositive of the due process of law question in the instant case. We are in agreement with the Pittsburgh Press argument that the "particulars" (required by the Ordinance) as set forth in the original complaint of N.O.W. lacked some specificity. Nevertheless, we hold that the complaint particulars were adequate and sufficiently specific under the test of fairness. We hold that the Pittsburgh Press was properly and adequately informed of the charged violation of Subsection 8(j) of the Pittsburgh Human Relations Ordinance, as amended. The appellant newspaper had notice and knowledge of the charge that it was aiding employers to unlawfully discriminate by the placing of employment advertisements under the arbitrarily segregated male and female columns on the advertising pages of the newspaper.

The Pittsburgh Press was afforded all of the protections required in the proceedings before the Commission, and therefore we hold that the Pittsburgh Press was not denied its constitutional right to due process of law.

Counsel for the Pittsburgh Press further argues that an additional deficiency in the complaint was the lack of any specific incident wherein column segregated employment advertisements resulted in sex discrimination to a particular woman.

The nature of the charge herein filed is discrimination against a class (women). It is well established that when the Legislature proscribes discriminatory acts against a class it is unnecessary for the complaining class representative to allege specific injured parties.

*See Pa. Human Relations Commission v. Chester School District*, 427 Pa. 157, 233 A. 2d 290 (1967). If the advertising column headings here are discriminatory, they are in violation of the Ordinance per se, and there need not be a specific "particular" on an actual discrimination suffered by any particular woman. If discriminatory, the column headings were in violation before the first woman actually suffered any act of discrimination.*

We note here that contrary to the argument of the Pittsburgh Press that the record does not disclose any specific incident of discrimination against any specific woman, a careful reading of the record indicates that one witness did in fact testify to such a result. Her testimony indicated that she responded to an ad placed in the "Jobs-Male Interest" column for a "dishwasher" and was advised by an agent of the employer that he had been given specific instructions not to hire a female for the advertised job. The interesting point is that counsel for the Pittsburgh Press, while arguing that this testimony was irrelevant, admitted on the record that this witness may well have had legitimate grounds upon which to file a complaint before the Commission. In view of the fact that the discriminatory practice came about as a result of an ad placed by the employer and was published in an arbitrarily segregated "male" column, we hold that there was substantial evidence

---

* We note with interest the language of the Pa. Human Relations Commission, Guidelines On Discrimination Because of Sex, Pa. Bulletin No. 24, Vol. 1, p. 707, Dec. 19, 1970, "The placement of an advertisement seeking applicants for employment in a classified advertisement section under 'Help Wanted—Male', or 'Help Wanted—Female Interest' or similar columns with a sex designation is considered to be a violation of §5(b)(2) [Pa. Human Relations Act, Act of July 9, 1969, P. L. 133, 43 P.S. 955] if an employer is covered by the Act and has not received a bona fide occupational qualification exemption from the Commission."

placed in the record to support the charge made by N.O.W.

## VIOLATION OF THE ORDINANCE

The Pittsburgh Press argues that its manner of job classification column heading arrangement was selected for the purpose of providing maximum aid to both the advertiser and the job applicant. The Pittsburgh Press insists that this manner of arranging employment advertisements is oriented to the interests of persons seeking employment. The record does not support this contention. The record clearly demonstrates that this sex segregated system of want ad column classification is geared primarily to the interests and desires of employers. The Pittsburgh Press further argues that in the event discriminatory motivations are found on the part of a particular employer, nevertheless the Pittsburgh Press is exculpated by way of the prior cited "disclaimer."

We have long passed that point in the advancement of civil rights whereby a declaration of intent can be used as a screen or defense for actual discrimination. The "separate but equal" principle is no longer a legitimate argument in civil right cases. We agree with counsel for the Pittsburgh Press when he states, "The purpose of the statute was to prohibit practices which denied job opportunities to individuals because of sex." The Pittsburgh Press cannot frustrate that purpose by a declaration that column headings are arranged for a reader's convenience and that any recourse to be had by women lies against those employers who do in fact discriminate.

The right to work and its concomitant opportunity to achieve economic security and stability are essential to the pursuit of life, liberty and happiness. As early

as 1915, the United States Supreme Court declared that: ". . . the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the Amendment [Fourteenth] to secure. Truax v. Raich, 239 U.S. 33, 41, 60 L. Ed. 131, 135 (1915)."

To anyone who even once has viewed women participating in a roller derby, the argument that all women are the weaker sex, desirous of only the more genteel work, carries little weight. The success of women jockeys is further evidence of which we can take notice. It is no longer possible to state that all women desire, or have an "interest" in, any one type or classification of work. Some woman have the desire, ability and stamina to do any work that men can do. Once we accept such a premise it then becomes logically impossible to permit continued segregation of employment want ads by column headings for any job coming within the purview of the Ordinance.

The law recognizes few absolutes and the necessity to recognize the legitimate exceptions continues. As a society we continue to recognize the existence of certain differences between men and women and consequently, exceptions permitted under Section 8 of the Ordinance, *supra,* by certification of the Commission are a legitimate and proper method to differentiate, provided that such grants are both reasonable and legal. Any employer having a legitimate need to so advertise may apply for the legislatively recognized exemption. Interestingly, both the Pittsburgh Press and the ANPA agree that in the absence of an exemption, the Pittsburgh Press could not utilize column headings such as "Jobs—Black Interest" or "Jobs—White Interest" or "Jobs—Catholic Interest" or "Jobs—German Interest", etc.

The appellants argue that the discrimination cases are analogous to the "false advertising" cases, wherein

the courts have held that a newspaper cannot be held liable for the false advertising of an advertiser. We feel compelled to reject the analogy for the reason that the maintenance of segregated column headings in and of themselves is indicative of a newspaper's participation in an illegal discriminatory scheme. On the other hand, the simple publication of a particular advertisement later found to be false, without proof of complicity, actual or constructive, casts no shadows of liability onto a newspaper.

This is not a matter of whether the Pittsburgh Press intentionally conspired with some employer or employers to discriminate against women. What is of importance is that through the use of its arbitrarily selected column headings the Pittsburgh Press "aids" such employers to discriminate. When the Pittsburgh Press arbitrarily arranges and publishes such column headings it is aiding in sex discrimination. The ruling that employment want ad column headings be written asexually is appropriate because it eliminates the difficulties of evaluating sophisticated medical, sociological, and actuarial theories of aggregate differences between the sexes. It is proper because it represents the highest degree of societal commitment to the ideal of legal sexual equality. Perhaps more importantly, asexual employment advertising column headings will aid in guaranteeing women their fundamental right to be hired and judged on the basis of individual characteristics and capabilities.

The Pittsburgh Press and ANPA argue that a distinction exists between sex and the other protected classes. To the contrary, we hold that acts of discrimination prohibited by this Ordinance apply *equally* to "any difference in treatment based on race, color, religion, ancestry, national origin, place of birth, or sex." There is not one word to be found in the Ordinance which could support appellants' argument that discrimination on the

basis of sex is to be treated any differently than discrimination in any of the other categories. Sex, like race and lineage, is an immutable trait, a status into which the class members are locked by the accident of birth. What differentiates sex from the so-called "non-suspect statuses", such as intelligence or physical disability, and aligns it with the recognized "suspect" classification (race) is that the characteristic usually bears no relation to ability to perform or contribute to society. The result is that the entire class is abrogated to an inferior legal status without regard to the capabilities or characteristics of its individual members. Women, like blacks, have historically labored under legal and social disabilities. Like black citizens, for many years they were denied the right to vote and until recently were unable to serve on juries in many states. Married women in this state were placed in a different position vis-a-vis their property rights. None of these distinctions was based upon legitimate differences. The pedestal upon which history and the law have placed women has evolved into an isolation booth, far removed from some of the rights afforded the rest of society.

In *Sail'er Inn, Inc., et al. v. Kirby*, 95 Cal. Rptr. 329, 334, 485 P. 2d 529, 534 (1971), the California Supreme Court refused to uphold legislation designed to protect women in not permitting them to work behind a liquor bar. The Court said: "But even if we assume that bartending is more dangerous than waiting on tables, there is no evidence that women bartenders are more likely than male bartenders to suffer injury at the hands of customers. A desire to protect women from the general hazards inherent in many occupations cannot be a valid ground for excluding them from those occupations under Section 18. Women must be permitted to take their chances along with men when they are otherwise quali-

fied and capable of meeting the requirements of their employment."

In *Weeks v. Southern Bell T. & T. Co.*, 408 F. 2d 228, 236 (1969), the Court stated: "What does seem clear is that using these class stereotypes denies desirable positions to a great many women perfectly capable of performing the duties involved. . . . Moreover, Title VII* rejects just this type of romantic paternalism as unduly Victorian, and instead vests individual women with the power to decide whether or not to take on unromantic tasks. Men have always had the right to determine whether the incremental increase in remuneration for strenuous, dangerous, obnoxious, boring or unromantic tasks is worth the candle. The promise of Title VII is that women are now to be on equal footing. We cannot conclude that by including the bona fide occupational qualification exception Congress intended to renege on that promise. . . . The principle of non-discrimination requires that individuals be considered on the basis of individual capacities and not on the basis of any characteristics generally attributed to the group. (And at page 235) We conclude that the principle of non-discrimination requires that we hold that in order to rely on the bona fide occupational qualification exception, an employer has the burden of proving that he had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved."

This quotation captures the essence and purpose of this Pittsburgh Ordinance.

The state of a human being without a job is a neutral fact, equally applicable to both sexes. The finding

---

* "Title VII" refers to the Civil Rights Act of 1964, 42 U.S.C. 2000(e).

of a job should also be a neutral fact, equally accessible to both sexes.

In *Richards v. Griffith Rubber Mills*, 300 F. Supp. 338, 340 (D.C. Or. 1969), the United States District Court held that refusal to hire a qualified woman job applicant could no longer be supported by reliance on a state law and ruled as follows: ". . . Except in rare and justifiable circumstances . . . the law no longer permits either employers or the states to deal with women as a class in relation to employment to their disadvantage. . . . Individuals must be judged as individuals and not on the basis of characteristics generally attributed to racial, religious or sexual groups."

In the case of *Reed v. Reed,* not as yet reported, but handed down by the United States Supreme Court on November 22, 1971, 40 L.W. 4013, where the Court held unconstitutional those portions of an Idaho statute giving preference to males in the granting of letters of administration in estates, the Court said: "By providing dissimilar treatment for men and women who are thus similarly situated, the challenged section violates the Equal Protection Clause." We are guided by such pronouncements.

Finally, under this section, ANPA also raises the specter of an alleged violation of the newspaper's constitutional right to "freedom of the press". We hold this argument to be non-meritorious. A restriction on discriminatory column headings in employment want ads does not interfere with the editorial policy of the newspaper. There is precedent for the principle that advertising, per se, does not come within the purview of this constitutional right. In the case of *Lorain Journal Company v. U. S.,* 342 U.S. 143, 96 L. Ed. 162 (1951), the United States Supreme Court held that an injunction restraining a publisher under the Sherman Antitrust Act from refusing to accept local advertising from

customers using a competitive radio station for the same purpose did not violate the constitutional right of freedom of the press as a prior restraint upon what the newspaper could publish.

In the case of *Kovacs v. Cooper*, 336 U.S. 77, 93 L. Ed. 513 (1949), the Court upheld a city ordinance prohibiting sound amplifiers used in public streets, stating that although freedom of speech is given a "preferred position," nevertheless "to enforce freedom of speech in disregard of the rights of others would be harsh and arbitrary in itself." As was pointed out by the United States Supreme Court in the case of *Mutual Film Corp. v. Industrial Commission*, 236 U.S. 230, 59 L. Ed. 552, 559 (1915), the underlying safeguard of the constitutional provision for freedom of the press is "that opinion is free and that conduct alone is amenable to the law."

Whether the Pittsburgh Press has a constitutional right to print editorials, or news columns, or byline stories for or against sex discrimination is not the issue before us. What is before us is the question of whether in its advertising business the use of arbitrarily sex-segregated employment want ad column headings by this newspaper "aids" an employer in sex discrimination. The Commission and the court below concluded in the affirmative. We affirm those findings and conclusions.

### BROADNESS OF COMMISSION ORDER

The Pittsburgh Press properly points out that Section 4(c) of the Ordinance states: "Employer—Any person who employs five or more employees, exclusive of the parents, spouse or children of such person, including the City of Pittsburgh, its departments, boards, commissions, and authorities and any other governmental agency within its jurisdiction, but excluding any reli-

gious, fraternal, charitable or sectarian organization which is not supported in whole or in part by any governmental appropriations."

Section 4(d) of the Ordinance states: "Employment —The term 'employment' shall not include the employment of individuals in domestic service." The record clearly shows that approximately 25 percent of the advertisers placing employment want ads in the Pittsburgh Press are based within the City of Pittsburgh. The record further indicates that the Ordinance cannot affect out-of-city advertisers seeking employees for jobs located outside the jurisdiction of the Commission. Perhaps more importantly the Pittsburgh Press points out that in the introductory clause of Section 8 it is stated: "It shall be an unlawful employment practice, except where based upon applicable national security regulations established by the United States, by the Commonwealth of Pennsylvania, or by any political subdivision of the Commonwealth having jurisdiction in the City of Pittsburgh, or *except where based upon a bona fide occupational exception certified by the commission* in accordance with Section 7, Subsection (d) of this ordinance: . . ." (Emphasis added.)

It is clear then that the Ordinance itself sets forth a number of exemptions whereby it would be legally permissible to discriminate. We are not called upon to pass on the morality or social wisdom of such exemptions; and certainly it is not within the scope of review of this Court to review the philosophical beliefs or the wisdom of the legislative body which created this Ordinance. The question presented to us is whether the order of the Commission was too broad.

For the purpose of clarification on this point, we set forth the order of the Commission which reads as follows:

"AND NOW, to wit, this 23rd day of July, 1970, in accordance with the foregoing discussion, findings of fact, and conclusions of law, it is ordered, adjudged, and decreed that:

"1. The Pittsburgh Press shall, within thirty (30) days from the date of this order, cease and desist from violating Section 8(j) of Ordinance No. 75 of 1967, as amended, and that

"2. The Pittsburgh Press shall, within thirty (30) days from the date of this order, utilize the classification system of employment advertisement with no reference to sex."

The lower court affirmed this order except as to the extension of time. There can be no question that the order of the Commission restricts the Pittsburgh Press from making *any* reference to sex in its classification system of employment advertising. We must agree with the argument that the order of the Commission is too broad.

Section 402 of the Appellate Court Jurisdiction Act, (ACJA), Act 1970, July 31, P. L. 673, No. 223, 17 P.S. 211.402, gives jurisdiction to this Court on appeals from the common pleas court, when the "application, interpretation or enforcement" of a local ordinance, such as here, is in question. This Court is given the power to modify the order of either the lower court or of the Commission in Section 504* of the ACJA, *supra*. We will therefore modify the above-noted order of the Commission and the order of the lower court, and direct the Court of Common Pleas to enter it in conformity with this opinion. In all other respects

---

* "Section 504. Disposition of Appeals.—An appellate court may affirm, modify, vacate, set aside or reverse any order brought before it for review, and may remand the matter and direct the entry of such appropriate order, or require such further proceedings to be had as may be just under the circumstances."

we affirm the adjudication of the Commission and the order of the court below.

Based upon the above discussion, we

ORDER

AND NOW, this 27th day of January, 1972, in accordance with the adjudication of the Pittsburgh Human Relations Commission, dated July 23, 1970, and the Opinion of the Commonwealth Court of Pennsylvania filed this date, it is hereby ordered that the Pittsburgh Press Company shall within thirty (30) days from the date of this Order, cease and desist from violating Section 8(j) of the City of Pittsburgh Ordinance No. 75 of 1967, as amended, including all reference to sex in employment advertising column headings, except as may be exempt under said Ordinance, or as may be certified as exempt by said Commission. This Order shall be entered forthwith in the records of the Prothonotary of Allegheny County at No. S.A. 768 of 1970.

DISSENTING OPINION BY JUDGE CRUMLISH, JR.:

I dissent. The Pittsburgh Press Company has been cited by the Pittsburgh Commission on Human Relations for aiding or participating in the unlawful employment practice of publishing advertisements which discriminate the sexes. The Commission stated in its opinion: "As a necessary step in the adjudication of this case, the Commission must determine whether the action of an employer in causing an advertisement to be placed in a sex-segregated column itself violates the ordinance." I believe that the factual findings of the Commission, as recited in either the formal findings of fact or the text of the Commission's opinion, are not sufficient to support the conclusion that advertising in gender-segregated columns establishes of itself discrim-

ination in employment. Absent proof, Pittsburgh Press cannot be justifiably accused of aiding in an unlawful employment practice.

As the majority said, we are reviewing the findings and conclusions of the Commission and not those of the court below. *Romain v. Middletown Area School District*, 1 Pa. Commonwealth Ct. 419, 421, 275 A. 2d 400 (1971). We must therefore look to the Decision and Order of the Commission in determining whether an unlawful employment practice occurred.

Section 10(i) of the Pittsburgh Human Relations Ordinance reads in part: ". . . If upon all the evidence presented, the Commission finds that the respondent has engaged or is engaging in an unlawful practice, *it shall state its findings of fact in writing* and shall issue such an order in writing *as the facts warrant. . . .*" (Emphasis added.) For Pittsburgh Press to be guilty of aiding and abetting an unlawful practice, Section 10(i) would require factual findings by the Commission evidencing unlawful discrimination by employers. The Commission's failure to substantiate its legal conclusions is fatal to its adjudication of the publisher's guilt.

Only the following findings of fact were set forth by the Commission:

"1. The Pittsburgh Press is a newspaper of general circulation, and is engaged in business as a newspaper within the City of Pittsburgh.

"2. The National Organization for Women is an organization which has as one of its purposes combating discrimination on the basis of sex. The Pittsburgh Chapter of the National Organization for Women has an office within the City of Pittsburgh.

"3. In 1969, the Pittsburgh Press ran a total of 248,000 help-wanted advertisements in its daily and Sunday editions.

"4. Of this advertising, 25 percent is placed by advertisers based in the City of Pittsburgh.

"5. The Pittsburgh Press permits the advertiser to select the column within which its advertisement is to be inserted.

"6. When an advertiser does not indicate a column, the Press asks the advertiser whether it wants a male or female for the job and then inserts the advertisement in the jobs-male interest or jobs-female interest column accordingly.

"7. Prior to October of 1969, the Pittsburgh Press carried headings or captions on its relevant employment column as follows: "Male Help Wanted," "Female Help Wanted," and "Male-Female Help Wanted."

"8. From October of 1969 to the present time, the captions read: "Jobs-Male Interest," "Jobs-Female Interest," and "Male-Female."

"9. The Pittsburgh Press is an agent for the Pittsburgh Post-Gazette in the processing of employment advertisements.

"10. The Pittsburgh Press is the twelfth largest classified advertisement newspaper in the United States. The approximate circulation of the Pittsburgh Press daily is 350,000 and on Sunday 750,000."

These form the basis which purports to support the Commission's legal conclusion that "[i]t is an unlawful employment practice for an employer . . . to cause to be published an employment advertisement in a newspaper column, which column contains a caption with a designation as to sex." Clearly, the factual findings of the Commission, standing alone, do not support the conclusion reached. There is no factual showing that gender-segregated advertisements, with prominent disclaimers of discrimination, do in fact cause discrimination in employment.

The decision of the Commission allows three bases for its conclusion that gender-segregated columns are unlawful advertising by employers. First, it relies on the testimony of the Press' Classified Ad Manager who said that, in determining in which column to insert the advertisement of a prospective employer who did not proffer a column preference, he advises the employer which of the sexes usually fills that particular position or he tries "to find out what type of person [the employer is] looking for." Although this testimony is damaging to the publisher's case, I see nothing more to this than that in an undetermined number of cases, all of which could have been exempt from or beyond the limits of the Commission's jurisdiction, employers do advertise in a particular column for the purpose of obtaining the service of a male or female. It was incumbent upon the Commission, however, to determine by evidence and factual findings, that the publisher's system was so egregious as to require the complete elimination of the practice rather than increased policing or regulation of it.

The second reason advanced by the Commission in its conclusion was "the necessary implication of the segregated columns . . . that men are given preference for jobs in one set of columns, and women are given preference for jobs in the other set . . . supported by the fact that the Pittsburgh Press runs a third section of employment advertisements, 'male-female' . . . available to men or women without discrimination." Are we to uphold the Commission's conclusion of "necessary implication" of discrimination when this conclusion is neither explained or substantiated by factual finding? Can we not say that another "necessary implication" is that an employer is seeking to reach the greatest number of qualified applicants by his action? Placing an advertisement in a gender-segregated column with this

motive would not be an illegal practice. Would the Commission proscribe advertising in the Jewish Exponent or Ebony Magazine because of the "necessary implication" that such advertisements do not reach non-Jewish and non-Black potential applicants? State and municipal administrative tribunals must act upon the findings of fact as adopted by them. They may not rely upon "necessary implications" without adopting a sufficient basis in fact to support it.[1]

Finally, the Commission takes notice of certain jurisdictions which have found gender-segregated column unlawful per se. In each jurisdiction, the determination of unlawfulness was made by administrative regulation. The conclusion of per se discrimination has not heretofore been judicially tested in any of these jurisdictions. Nor has the Commission set forth or adopted the factual basis upon which these jurisdictions have reached this conclusion.

It is most unfortunate and disturbing to me to observe that in this landmark litigation, the adjudicating body has chosen to disregard the evidence presented it; that instead of seeking proof of its position, it has chosen to rely on unsubstantiated hunches and feelings. The issue raised herein deserves and requires greater in-depth consideration of the evil of gender-segregated want ads. The Commission's opinion and findings of fact do not substantiate their position that gender-

---

[1] We note, as the brief for the National Organization for Women suggests, that the testimony of Dr. Sandra Bem of Carnegie-Mellon University contains ample basis for finding that the full force and effect of an ad placed in the male column is to discourage women from applying. However, the Commission made no finding on the issue and did not use this testimony as support in its adjudication. We cannot guess as to the credence and credibility which the Commission ascribed to Dr. Bem's testimony. Under the mandate of Section 10(i) of the City's ordinance, we can only assume that the Commission disregarded this evidence.

segregated advertising is an unlawful employment practice.

Finally, it is necessary to comment upon the relationship of gender to other traits such as race, religion or ancestry. The court below stated in its opinion that "[s]ex classification is as unlawful as general captions of 'Black', 'White', 'Catholic', 'Presbyterian', 'Italian', 'Polish', or 'German' would be unlawful. [That] court will not reverse the determination that sex is an unlawful general designation just as any other comparable designation which uses sex, race, religion or national origin would be contrary to law." The majority adopts this position. I cannot, however, agree that classification by gender is by itself discriminatory.

To classify job interest by race or natural origin, while it may have some basis in fact, would be unlawful. The illegality of such advertising lies in the fact that the preferences expressed by such groups are the result of socio-economic factors, not innate characteristics of race or national origin. It is unlawful discrimination, without proper basis, to classify race or national origin socio-economically.

Unlike race and national origin, gender classification is based upon biological and emotional differences. The Bona Fide Occupational Qualification exemption for job related discrimination based upon gender clearly demonstrates that gender classification may have non-discriminatory bases in fact. The question of *innate* differences in job *preference,* as well as in occupational ability, is not per se unfounded. We must keep in mind that only unnatural or unjustifiable discrimination is wrongful. In my judgment, discrimination by natural classification does not violate anyone's Constitutional rights.

Because of the nature of sexual differences, as opposed to racial or ethnic differences, it was necessary

for the Commission to dispell the notion that the Pittsburgh Press method of gender-segregated advertising results in gender-segregated employment practices which, even if distinguished by gender are based upon bona fide natural differences between the sexes. This classification would not be "discrimination" within the meaning of the Pittsburgh ordinance.

Despite the assertion by the lower court to the contrary, the task before the Commission was not formidable. Indeed the record before it may even contain "substantial evidence" upon which to ground its result. But the Commission must clearly adopt those findings of fact upon which it bases its conclusions of law. It must not be moved by current popular sentiment to implement its own whims, feelings and philosophy. It must never be so zealous in the protection of the right to be free from discrimination as to act without legal basis; for when government becomes too protective, the basic freedoms we all enjoy erode, move into the legal dark ages, and we are back again to mere hope for basic freedoms.

Judge MENCER joins in this Dissenting Opinion.

---

DISSENTING OPINION BY JUDGE MENCER:

I respectfully dissent. The complaint in this case alleged a violation by The Pittsburgh Press Company (appellant) of Section 8(j) of the City of Pittsburgh's Human Relations Ordinance. Section 8(j) makes it an unlawful employment practice "to aid, incite, compel, coerce or participate in the doing of any act declared to be an unlawful employment practice or to obstruct or prevent any person from enforcing or complying with the provisions of this ordinance, or any rule, regulation or order of the Commission, or to attempt directly or indirectly to commit any act declared by this ordinance to be an unlawful employment practice."

The complaint does not allege any violation by anyone else. It is simply impossible for the appellant to be guilty of aiding another in the violation of the ordinance when no violation is even alleged and in fact no attempt was made to prove such a violation. It is fundamental that one cannot aid that which did not occur.

I must conclude that due process clearly requires that, without alleging or proving a violation of the ordinance by an employer who was aided by appellant, the complaint is invalid on its face and should be dismissed.