316

General Electric Corporation, Appellant, *v.* Commonwealth of Pennsylvania, Pennsylvania Human Relations Commission, Appellee.

Argued February 5, 1975, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, MENCER, ROGERS and BLATT. Judge WILKINSON, JR. did not participate.

*Frederick N. Egler,* with him *Egler & Reinstadtler,* for appellant.

*Katherine H. Fein,* with her *Jay Harris Feldstein,* Assistant General Counsel, for appellee.

OPINION BY JUDGE KRAMER, March 27, 1975:

This is an appeal filed by General Electric Corporation (GE) from a final order of the Pennsylvania Human Relations Commission (Commission) dated April 1, 1974. The order was based upon findings and conclusions in which the Commission determined that GE had violated section 5(a) of the Pennsylvania Human Relations Act (Act), Act of October 27, 1955, P.L. 744 §5, *as amended,* 43 P.S. §955(a) (Supp. 1974-1975) through unlawful discriminatory employment practices based on sex.

The case had its genesis when on September 17, 1971 Agnes Stoklas, Mary Kush, and Anna Katynski (complainants) filed a complaint with the Commission alleging unlawful discriminatory practices in employment under section 5(a) of the Act, which "took place on or about April 14, 1971" and which are alleged to have been of a continuing nature until at least September 17, 1971. The main allegation of the complaint reads as follows:

"The Complainants allege that [GE] failed to offer the complainants and other female employees similarly situated the same terms and conditions to secure full time employment after phasing out the coil depart-

ment because of their sex, female, while offering less senior males of the same work unit full time employment in all areas not effected [sic] by the elimination of the coil department."

At hearings held before members of the Commission, the following pertinent facts were developed as a matter of record. In November of 1970, GE employed in the Coil Department of its Pittsburgh service shop 46 employes, 21 of whom were women. All of the employes held positions under a company classification designated with a capital "R" prefix, i.e., R-2 through R-24. The lower numbers represented lower classifications with corresponding lower rates of pay. All of the 21 women held positions which were classified betwen R-6 and R-9, with the complainants all being classified as R-9. All of the male employes held positions which were classified between R-12 and R-14. Most of the female workers, including the claimants, were known as "coil taper" employes who wrapped insulation on wire coils of various diameters and lengths. There were two methods for the payment of wages to these employes. The first was a regular hourly wage, and the second was an incentive pay scale, whereby the employe received a regular hourly scale plus payment for piecework. All 21 females in the department were under the incentive work program. The record indicates that most of these women, including the claimants, received a total incentive wage payment higher than that of the regular hourly employes (male and female) with higher classifications (apparently even through the pay scale for R-14). At all times pertinent to this case all employes had the right to "bump" into other positions of equal or lower classification. In addition, on a regular basis, job openings to higher classifications were published on GE bulletin boards located at places within the Coil Department facilities. Any employe could make a bid, if he or she met the qualifications for these higher positions.

At this point we must note that discrimination based upon sex was made unlawful by an amendment to the Act made via the Act of July 9, 1969, P.L. 133, §2, *as amended,* 43 P.S. §955(a) (Supp. 1974-1975) which amendment became effective July 9, 1969. At the hearings in this matter, the Commission, over the objections of GE, devoted a considerable portion of the record to incidents and procedures occurring prior to the effective date of the sex discrimination amendment. The Commission ruled that while evidence of events occurring prior to July 9, 1969 could not be used "to prove the substance of what they indicate," it could be admitted into evidence to show a "state of mind." While we agree with the Commission that, in some cases, actions of an employer prior to the effective date of the Act's provisions might be relevant,[1] our reading of this record and the Commission's adjudication reveals that in the instant case the challenged evidence was not relevant. Furthermore, our reading of the adjudication shows that the Commission relied so heavily upon action by GE prior to July 9, 1969 that we must conclude that the Commission acted improperly. The complaint alleges that the unlawful discrimination occurred "on or about April 14, 1971" and, under our ruling in *Pittsburgh Press Employment Advertising Discrimination Appeal,* 4 Pa. Commonwealth Ct. 448, 287, A.2d 161 (1972) ; *aff'd.,* 413 U.S. 376 (1973), due process of law requires that the "accused" be informed with reasonable certainty of the nature of the accusation lodged against him. In this case, therefore, it was improper for the Commission to permit over objection extensive evidence concerning matters which occurred as

---

1. For example, had the Commission attempted to show that GE's management had conspired to thwart the purposes of the Act, in contemplation of its passage by the Legislature, we would not hesitate to sanction the use of such evidence by the Commission, despite the fact that the evidence would relate to action taken before the Act went into effect.

early as 1968, and then to use such evidence to support its adjudication.

In any event the record indicates that on November 17, 1970, the manager of the plant formally notified all of the employes that during 1971, GE would discontinue the Coil Department at its Pittsburgh installation and transfer this same operation to a new location in Ohio for economic and business reasons. At that time all of the employes were offered the opportunity to transfer to Ohio and the manager was able to obtain from GE approval for payments to help defray the cost of moving for any employe who desired to transfer to Ohio. The record does not indicate that any of the employes showed any desire to transfer to Ohio. At the November 17, 1970 meeting, the manager informed the employes that GE was attempting to expand another department (at its Pittsburgh plant) known as the Random Wound Department, which hopefully would enable GE to continue to employ the coil wrappers, including the claimants. All of the employes were requested to fill out a form designating preferences for other jobs at the Pittsburgh plant, and all of the complainants indicated their first preference for the Random Wound Department which, to the date of the hearings, had not yet been expanded. Following this, all of the employes of the Coil Department were provided the opportunity to "bump" to the same or lower R-rated jobs. As it turned out, the only jobs to which any of them could "bump" were positions as sweeper or janitor. The "bumping" procedures were covered by a union contract between GE and the International Union of Electrical, Radio and Machine Workers (A.F.L.-C.I.O.), which agreement was entered into evidence. None of the female Coil Department employes exercised their rights to "bump." Although the union contract provided for the usual grievance procedures, none of the female employes filed any grievances, except for the same allegations made in the complaint filed in this case. It is interesting to note

that these grievances were resolved against the female employes under the union grievance procedures.

We should also highlight the fact that the three complainants here involved were employes with high seniority rights. The union contract provided that seniority was to be a "major" factor in determining transfers during a layoff, but it also provided that "ability will be given consideration" and that seniority should be a major factor in rehiring "if the employe is able to do the available work in a satisfactory manner after a minimum amount of training."

Statistical exhibits were submitted by both GE and the complainants which indicated that out of the total 46 employes of the Coil Department, 21 of the 25 male employes were at least temporarily transferred to other jobs, depending upon their preference as shown on the written request made by GE (as mentioned above) and because of their qualifications or experience. Three of the men exercised union rights by "bumping" into other positions and one retired. Of the 21 female Coil Department employes, none exercised their right to "bump" into other positions, and the record permits us to conclude that none of the female employes presented any qualification or experience to any one at GE which would indicate that they had equal or better qualifications and experience than any of the men who were transferred to other openings in other departments. In fairness, we should note that the record does indicate that two of the complainants had made bids on other jobs, and one of them was successful. Both of these bids, however, were in 1968.

Following the layoffs which occurred between January 14, 1971 and May 7, 1971, one female employe voluntarily went on sick leave, one retired, two at the time of the hearing were working full time and four had been called back for intermittent work during 1971 at the same or higher classifications. The complainants' evidence

also indicates that at the time of the latest information obtained by the Commission's investigator (October 1, 1971), all three of the complainants had had their job classifications increased to R-10.

It is apparent to us that the Commission utilized these statistical exhibits which indicate that most of the men were transferred into other jobs and most of the women were laid off as the basis for its conclusion that GE had violated section 5(a) of the Act.

On appeal to this Court GE presents three contentions. First, GE argues that it was deprived of due process of law by virtue of the conduct of the hearings by the Commission and because the Commission found GE to be in violation of the Act in a manner inconsistent with the allegations charged in the complaint. Our review of this record permits us to state without further comment that these contentions are without merit. Secondly, GE contends that certain of the Commission's findings of fact are not supported by substantial evidence. Lastly, GE asks us to hold that the Commission committed an error of law in concluding that GE should be held in violation of the Act.

Our scope of review in these cases is limited and the Commission will be sustained unless its adjudication is based upon facts or conclusions not supported by evidence or unless it has committed a clear abuse of discretion, violated the constitutional rights of the parties, exceeded its power or based its conclusions upon an erroeous interpretation of the law. *Tomlinson Agency v. Commonwealth of Pennsylvania, Pennsylvania Human Relations Commission,* 11 Pa. Commonwealth Ct. 227, 312 A.2d 118 (1973).; *Wilkinsburg School District v. Human Relations Commission,* 6 Pa. Commonwealth Ct. 378, 295 A.2d 609 (1972). *See also,* section 10 of the Act, 43 P.S. §960 (Supp. 1974-1975), and Section 44 of the Administrative Agency Law, Act of June 4, 1945, P.L. 1388, *as amended,* 71 P.S. §1710.44.

In connection with the substantial evidence issue raised by GE, we have stated many times that "substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *A. P. Weaver and Sons v. Sanitary Water Board*, 3 Pa. Commonwealth Ct. 499, 284 A.2d 515 (1971). While it would be easy to "nitpick" and thereby conclude that some of the 59 findings of fact do not accurately reflect the testimony, none of the discrepancies we find are fatal. For example, one of the findings states that the 21 female Coil Department employes had risen to their highest R-classification "possible," while the record clearly demonstrates that any of these 21 female employes could have increased their R-classification during their long years of employment with GE if they had just made the attempt and qualified. Several of the findings are not really relevant to the issues before us. For instance, there is a finding that GE "violated its own 'affirmative action in providing equal employment opportunity' . . . by not taking affirmative steps to encourage" female employes to apply for other jobs. This finding is irrelevant for the reason that the statute does not require an employer to take affirmative action unless ordered to do so by the Commission after hearing and an adjudication. This record discloses that GE instituted and maintained an affirmative action program which appears to have been fairly applied.

The Commission's conclusions of law, however, are another matter. The pertinent statutory language is found in section 5(a) of the Act, 43 P.S. §955, which reads as follows:

"It shall be an unlawful discriminatory practice . . .

"(a) For any employer because of the . . . sex . . . of any individual to refuse to hire or employ, or to bar or to discharge from employment such individual, or to otherwise discriminate against such individual

with respect to compensation, hire, tenure, terms, conditions or privileges of employment, *if the individual is the best able and most competent to perform the services required. . . ."*

Because of GE's phaseout employment program or practices noted above, the Commission concluded that the "efficacy" of the statutory requirement emphasized in the quote immediately above was "vitiated" by GE's conduct and, further, that GE had violated the Act "by failing to take affirmative action to dispell an acknowledged, albeit erroneous, feeling among its employees that certain jobs at respondent's facility were for males and certain jobs at respondent's facility were for females." We hold that these conclusions of the Commission constituted errors of law.

This Court has held on several occasions that one of the elements necessary to support a charge of a violation of section 5(a) of the Act is proof (the burden of which is on the complainant) that the complainant is the best able and most competent to perform the services required. *G. C. Murphy Company v. Commonwealth of Pennsylvania, Human Relations Commission,* 12 Pa. Commonwealth Ct. 20, 314 A.2d 356 (1974), and *Romain v. Middletown Area School District,* 1 Pa. Commonwealth Ct. 419, 275 A.2d 400 (1971). Once again, relying upon our careful review of this record we are compelled to conclude that there was no evidence presented by the complainants that they had qualifications and abilities equal to or better than the members of the opposite sex who transferred to other employment in other departments of GE during or after the phaseout of the Coil Department. As we have already noted, none of the complainants or any other female employe of the Coil Department attempted to "bump" or bid for any other job. The Commission contends, however, that in spite of this fact GE somehow violated the provisions of section 5(a) of the Act by not taking some affirmative action to dispel the

"feeling" among the employes that there existed men's jobs and women's jobs in the Coil Department or elsewhere in the plant. This contention, however, is betrayed by virtue of the Commission's own adjudication which says that "although the atmosphere at General Electric may have induced a chilling effect on the proclivity of females to bid for higher rated positions, there is insufficient evidence for a finding that this was the overt or latent policy of respondent in this regard."

The point here is that there is no statutory requirement that any employer take affirmative action to dispel feelings among its employes, and the failure to do so cannot, therefore, be found to be an unlawful discriminatory practice. Even if there was such a requirement, the record in this case discloses that GE adopted and maintained an affirmative action program to end unlawful discriminatory practices in its plant. This fact was well known to the employes. Notices to that effect were placed upon the employes' bulletin board. The manager of the subject plant presented uncontroverted evidence of his efforts in this regard. Certainly the fact that the Coil Department, prior to phaseout, had a ratio of 21 females to 25 males was some evidence of the effectiveness of that program. The record also indicates that the hiring practices at the Pittsburgh plant were so arranged that the hiring of white male employes was subject to review by the plant manager, whereas the hiring of minority and female employes could be made without such review. This is further proof of an attempt to take affirmative action.

The burden was upon the complainants to prove that males in the Coil Department were given jobs for which the complainants (or for that matter, any female employe) had equal or better qualifications and abilities. This they failed to do. As a matter of fact, the record discloses that after the complainants had rested their case, GE took upon itself the task of proving that each

and every male employe of the Coil Department was placed into a position for which he had some qualification or ability. At no place in the record did the complainants prove that any of the complainants or any female employe of the Coil Department had the same or better qualifications and abilities.

While not in any way controlling in the case before us, there was only one incident related in this record which *might possibly* have permitted a conclusion that an unlawful discriminatory practice had occurred. That one incident involved a female employe who was not a complainant. She testified that, in 1950, she had been given the opportunity to move into another department in the position of a winder in the small motor division. Later she was transferred to another job as a connector. She stated that she bid for a job, subsequent to April of 1973, as a "magnetic winder" which job had been given to a man with less seniority. When she approached her supervisor, she was told by him that he believed she could not handle the job. According to her testimony, the man who received the job had no prior experience and was being trained for the magnetic winder position. According to the record, she had not filed any grievance and she did not file a complaint with the Commission. We do not pass upon whether or not this was an unlawful discriminatory practice, because that incident was not at issue in the complaint. The occurrence took place in 1973 long after the phaseout of the Coil Department, but, in any event, this is the only incident in this entire record which comes close to proof of any possible discriminatory act.

We want to make it clear that if this record disclosed in any way that any of these women had been refused the right to "bump" or the right to bid on another available job in which any man with less qualifications and ability had been placed, the result here would be different. The problem is that this record does not disclose any such

incident, with the possible exception of the one mentioned above. Likewise, if this record disclosed that GE had set about on a course of action to establish women's jobs in a lower classification with a design to give preference to male employes, the result would be different. Again, the problem is that the record does not support such a conclusion. The Commission seems to contend that seniority alone should have been utilized by GE in making job transfers and an examination of its order supports this observation. The statute does not support such a proposition. GE undertook the burden in its presentation and successfully proved that every male with less seniority who was transferred to another job in another department of the Pittsburgh plant had some qualification or ability justifying the transfer. There is not one word of testimony in this record which would permit us to conclude that any of these complainants, or any of the women in the Coil Department, were qualified to handle any of the positions which the men had filled. In addition, this record supports the GE contention that all employes had the same opportunity to learn about available openings through the notices on the employes' bulletin boards. There is evidence that GE had training programs, but there is no evidence that any female employe ever applied or was refused for any of such training programs.

In summary, we hold that the Commission erred in concluding under the facts of this case that GE had committed an unlawful discriminatory practice under section 5(a) of the Act. We hold that the complainants failed to meet their burden of proof that the complainants, or the female employes of the Coil Department, were denied any employment opportunity in any other department of GE for which they were "the best able and most competent to perform the services required," vis-a-vis any male employe of the department. We hold that a failure to utilize seniority alone in determining trans-

fers, under the facts of this case, cannot form the basis of a conclusion that an unlawful discriminatory practice was committed. We therefore

ORDER

AND NOW, this 27th day of March, 1975, based upon the above discussion, the final order of the Pennsylvania Human Relations Commission dated April 1, 1974 in the above-noted case is hereby reversed.