## A. P. Weaver and Sons *v.* Sanitary Water Board.

Argued September 8, 1971, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MANDERINO, MENCER and ROGERS.

*Leo M. Stepanian*, with him *Brydon & Stepanian*, for appellant.

*Marvin A. Fein*, Special Assistant Attorney General, with him *Allen B. Zerfoss*, Assistant Attorney General, *William M. Gross*, Assistant Attorney General, and *J. Shane Creamer*, Attorney General, for appellee.

OPINION BY JUDGE MENCER, December 8, 1971:

This is an appeal from an adjudication and order of the Sanitary Water Board (Board)[1] revoking the mine drainage permit of A. P. Weaver & Sons (appellant) for a bituminous coal open pit mining operation.

A mine drainage permit (No. 2768 BSM 23) was originally approved by the Board on *January 6, 1969,* for operations by appellant in Shippenville, Elk Township, Clarion County, Pennsylvania. On *October 24, 1969,* the permit was suspended because of violation of the conditions applicable to the permit based upon analysis of water samples of a spring on the property of Lillian Kiser located in the area adjacent to the mining operations. In the opinion of the Board, these samples indicated pollution of such waters as the result of mining operations. Consequently a hearing was held on *November 3, 1969,* at appellant's request to consider the Board's action in revoking the permit. Extensive testimony was heard and evidence presented at this hearing, but it was continued to permit the Department of Mines and Mineral Industries to have a geological study made of the area involved. Pending continuance of the hearing, the Board on *November 7, 1969,* reinstated appellant's permit. On *May 5, 1970,* the Board continued its hearing after which, on *January 18, 1971,* the Board by its adjudication and order revoked the permit.

---

[1] The Sanitary Water Board was abolished by Section 30 of the Act of December 3, 1970, P. L.    , No. 275, creating the Department of Environmental Resources. "All orders, permits, regulations, decisions and other actions of . . . [the] board . . . remain in full force and effect" under Section 34 of the same act, however, "until modified, repealed, suspended, superseded or otherwise changed by appropriate action of the agency assuming the applicable powers and duties. . . ." Under Section 35(b), this agency is now the Department of Environmental Resources, and references hereafter made to the Board should be construed as now applicable to the Department of Environmental Resources.

Appellant entered its appeal from the Board's order on *February 4, 1971,* and, four days later it petitioned this court for a special allowance of supersedeas. Prior to any hearing on the matter, however, by stipulation of counsel and under order of this court of *March 17, 1971,* appellant was authorized to continue its mining operations under the same mine drainage permit No. 2768 BSM 23 subject to conditions incorporated in this court's order.

It is necessary to understand that before an operator may commence open pit bituminous coal mining operations *two* permits are required: (1) a "mine drainage permit" under the "Clean Streams Law", Act of June 22, 1937, P. L. 1987, as amended, 35 P.S. §691.1 et seq.; and (2) a "mining permit" under the "Bituminous Coal Open Pit Mining Conservation Act", Act of May 31, 1945, P. L. 1198, as amended, 52 P.S. §1396.1 et seq. Appellant's original application for a mine drainage permit was for a "maximum surface area to be affected" of 138.66 acres. But the mining permit (No. 144.14) granted to appellant allowed operations on only 37 of those acres, and it desires to continue mining the remaining 101.66 acres. To do so, appellant, after completing the mining of the first 37 acres under this court's authorization (because of the supersedeas it might well have already completed this first stage), must then submit amendments to the basic mining permit No. 144-14 and satisfy the conditions stated in the supersedeas applicable to mine drainage permit No. 2768 BSM 23. Therefore, as the Board's brief states, "the issue of continued mining operations under mine drainage permit No. 2768 BSM 23 insofar as mining permit No. 144-14 as amended to date is concerned, is essentially moot. In view of Appellant's agreement to construct required facilities to treat existing and future mine drainage under the Court order and his actions to date in so doing, there appear to be no obstacles to

the Department reinstating the mine drainage permit and, on proper application, authorizing further mining at the site involved." We must, however, decide this appeal in order either to justify or nullify the conditions which the Board wishes attached to approval of any further mining operations.

Essentially, appellant attacks the adjudication and order of the Board as being arbitary and not supported by substantial, legally competent and credible evidence. More specifically, although appellant does not deny that the Kiser spring is polluted, it contends that there is no evidence that appellant caused the pollution and that, indeed, there is substantial evidence that the spring was polluted from various other sources before appellant commenced mining operations. Appellant further avers that certain of the Board's witnesses were not qualified to testify and that much of what they said, and often the exhibits about which they testified, was hearsay.

We are also directed to *obiter dicta* in *Sanitary Water Board v. Sunbeam Coal Corporation,* 91 Dauph. 70, 77, 47 D. & C. 2d 378, 387 (1969), that "in most cases the preliminary determination of being in 'violation' is based upon water samples taken in receiving streams which prove to contain excessive amounts of acid. But, a finding of a 'violation' should not stop at this point, and strict proof of the operator's responsibility [therefor] ought to be required because of the quasi-penal aspect of the charge and its ultimate effect upon the business of the person so charged."

Section 44 of the Administrative Agency Law, Act of June 4, 1945, P. L. 1388, 71 P.S. §1710.44, makes it clear that findings of fact necessary to support an adjudication must be supported by substantial evidence. "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S. Ct.. 206, 217 (1938). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established." *N.L.R.B. v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S. Ct. 501, 505 (1939). *See also Pennsylvaina Labor Relations Board v. Kaufmann Department Stores, Inc.*, 345 Pa. 398, 400-401, 29 A. 2d 90, 92 (1942), quoted with approval in *State Board of Medical Education and Licensure v. Schireson*, 360 Pa. 129, 133, 61 A. 2d 343, 346 (1948), and followed in *Pennsylvania Labor Relations Board v. Sand's Restaurant Corp.*, 429 Pa. 479, 481, 240 A. 2d 801, 802 (1968).

Unfortunately, as observed by former Dean E. Blythe Stason of the University of Michigan Law School in *"Substantial Evidence" in Administrative Law,* 89 U. Pa. L. Rev. 1026 (1941), the term "substantial evidence" does not lend itself to expression by a simple formula. "Construed grammatically, the term might conceivably, though not reasonably, mean something just merely beyond the limits of the mere 'scintilla' of evidence. . . . Under such a definition, the requirement would simply call for a searching of the record to find some relevant testimony to support the order, ignoring all countervailing testimony introduced by the opposing party. This construction, however, would virtually preclude judicial reversal of fact decisions even though grossly erroneous; and . . . it can scarcely be justified in many of the fields to which the substantial evidence rule is applied. . . . Again, and construed somewhat less restrictively, substantial evidence may be related to the term 'arbitrary and capricious action' in such manner as to permit setting aside decisions only if found to be arbitrary. [p. 1036]

* * * At the other extreme, the term 'substantial evidence' may, if one is willing to strain sufficiently, be construed to require a weighing of the testimony, a

balancing of the persuasive effect of the evidence on the one side of the material issues against that on the other. If this interpretation should be adopted, no evidence would be deemed 'substantial' unless, upon an examination of the whole record, substantial conviction of the 'rightness' of the decision should exist in the mind of the reviewing court. This construction would be fully as objectionable as the scintilla rule. It would make of the court a final arbiter on the issues of fact in all cases. If generally adopted, it would not only overload the courts, but, still worse, it would withdraw from the administrative tribunal 'appointed by law and informed by experience' the conclusiveness which common sense and good administration demand. [p. 1037]

* * * [Rather, "the most acceptable meaning to ascribe to the term" is this:] 'substantial evidence' should be construed to confer finality upon an administrative decision on the facts when, upon an examination of the entire record, the evidence, including the inferences therefrom, is found to be such that a reasonable man, acting reasonably, *might* have reached the decision; but, on the other hand, if a reasonable man, acting reasonably, *could not* have reached the decision from the evidence and its inferences then the decision is not supported by substantial evidence and it should be set aside. [p. 1038]

* * * Thus conceived and interpreted, the substantial evidence rule is eminently sound, provided always that it is limited to fact questions and not extended into the domain of legitimate administrative discretion, and provided, further, that the courts in passing upon what the reasonable man would or would not decide take due account of the element of technical expertness found to exist in the administrative arena." 89 U. Pa. L. Rev. at 1036-1038, 1051 (emphasis in original).

After carefully reading the entire record several times, we conclude that this case must be remanded to

the Board for two reasons: (1) certain written reports were introduced into evidence even though the persons who prepared them were not present at either hearing in order to testify or be cross-examined; and (2) the record is deficient in one major respect: an insufficient showing of a causal connection between the pollution of the Kiser spring and A. P. Weaver's operations.

As to the *first* of these, we refer specifically to the "geological study" of the area here involved which the Department of Mines and Mineral Industries (the functions of which are now, for the most part, consolidated in the Department of Environmental Resources; see Section 30(f) of the Act of December 3, 1970, P. L. , No. 275) was to have done following the first hearing on November 3, 1969. This report, dated December 17, 1969, was prepared by Gary L. Merritt, a geologist of the Division of Water Quality, Bureau of Sanitary Engineering, Department of Health. Merritt was unable to attend the May 5, 1970, hearing at which Department (of Mines and Mineral Industries) Exhibit No. 6, Merritt's report, was admitted into evidence. "Only for expediency . . ." (R. 97a), Ralph R. Garrison was called by the Department to testify as to the truthfulness and accuracy of all of the report except the concluding "Summary and Recommendations". Although Garrison visited the mining operation site with Merritt and others on the same day, the essential fact remains that Merritt was unavailable for a thorough explanation of his report and for cross-examination. Included in the body of the report were not only complex descriptions but conclusions and opinions as well.[2] The summary, which Garrison did not attest to, was still for the Board to consider and contained this sentence: "The operation to date has deteriorated water

---

[2] For example, "Ground water moves from the strip mine to Mrs. Kiser's spring."

quality so badly that further stripping in the area should not further degrade the water quality." In short, the potential effect of the report was so great that we feel Merritt himself should have been there to explain it.

We are, of course, aware that by Section 32 of the Administrative Agency Law, 71 P.S. §1710.32, administrative agencies "shall not be bound by technical rules of evidence at agency hearings, and all relevant evidence of reasonable probative value may be received." But we cannot accept, as we are asked to do, the following rule of law from 30 Am. Jur. 2d *Evidence* §1010 (1967) : "Where a laboratory test has been made by a public agency under a duty to perform such tests, the agency's report of the result is admissible as competent evidence of the matters or facts therein recited under the public records exception to the hearsay rule."

The Supreme Court of Florida, in *Smith v. Mott*, 100 So. 2d 173 (1957), to our knowledge, stands alone in its acceptance of such a rule which, in effect, extends the presumption that official acts or duties, in the absence of evidence to the contrary, have been properly performed. *See Vernon Township v. United Natural Gas Co.*, 256 Pa. 435, 439, 100 A. 1007, 1008 (1917) ; *Tremont Township School District Appeal*, 366 Pa. 404, 409, 77 A. 2d 403, 406 (1951) ; M: Brown, *Pennsylvania Evidence* 36 (1949).

In addition, *Smith v. Mott* concerned only a state board of health analysis report showing the presence of alcohol in a sample of blood collected by a county medical examiner. The following from 30 Am. Jur. 2d *Evidence* §991 (1967) is more applicable to our situation: "Moreover, it has been held that records which concern causes and effects, involving the exercise of judgment and discretion, expressions of opinions, or the drawing of conclusions, are not admissible as public records."

By analogy, had Merritt not been an employee of the Department of Health but instead an "independent third party",[3] we note that "In the absence of statute or special circumstances, it has *generally* been held that the report of an independent third party as to a test or experiment made by him, or testimony as to the contents thereof, constituted inadmissible hearsay where the author of the report did not testify and was not subject to cross-examination." Annot., 19 A.L.R. 3d 1008, 1011 (1968) (Emphasis added).

We think the correct interpretation of Section 32 of the Administrative Agency Law, as quoted above, has already been reached in *Commonwealth v. Bonser,* 91 Montg. Co. L. R. 351, 352, 46 D. & C. 2d 565, 565-566 (1969), which held that Section 32 "provides that the right of *reasonable* cross-examination shall be afforded in all administrative hearings", and, in fact, Section 32 itself states, "Reasonable examination and cross-examination shall be *permitted."* (Emphasis added in both instances). Equally persuasive is *Sanitary Water Board v. Stinard,* 68 Dauph. 26, 27 (1955),[4] which said, "The essential facts should be established by legally competent evidence and witnesses should be subject to cross-examination. Likewise, the reports of field investigators should not be admitted in evidence without calling as witnesses those who prepared the reports."

This principle has some application to Protestant's Exhibit No. 2, a Culligan water analysis report from a sample taken on February 20, 1969 (soon after the

---

[3] ". . . a person who is not a party to the litigation, or the employee of a party, except for the purpose of making the experiment or test, and who is not financially interested in the result of the controversy."

[4] Followed in *Sanitary Water Board v. Penn-Weir Construction Co.,* 69 Dauph. 218 (1956), and in *McPherson v. Connellsville Joint School Board,* 81 Dauph. 298, 32 D. & C. 2d 706 (1963).

mining operation began), from the Kiser spring. We realize the difficulty of getting several witnesses together in Harrisburg simultaneously, but, had the proper Culligan personnel been able to testify, and had that company's experience with the Kiser spring been revealed fully (including its analysis of a second sample taken on January 2 or 3, 1970), this case could be more clearly understood.

As to the *second* point, *i.e.*, an insufficient showing of a causal connection between the pollution of the Kiser spring and A. P. Weaver's operations, we feel as the court did in *Sanitary Water Board v. Stinard*, *supra*, that "[u]nder the present record the Board has relied too much upon inference."

The "reasons for feeling that this operation is polluting the waters of the Commonwealth" are succinctly stated by Walter V. Kohler, Chief of the Division of Mine Drainage Control, Department of Mines and Mineral Industries, at pages 144a-145a of the record.[5] Not only was he making an assumption,[6] but

---

[5] "Since we at the time the original investigation was made did not pick up any samples of discharges such as we have now, we have got to assume that the mining—we are assuming that the mining is causing this deterioration because of the geological conditions that are adjacent to these discharges, these conditions indicating that the ground water in this area would have to move off on the pattern it has moved off, and since the area has been fractured and a lot less tight or solid in construction than before it was mined, the water itself was now finding its way freely off the low side of the coal bed. This is why we have these discharges there now.

"The discharges do not only involve the water that is in the spring of Mrs. Kiser but other springs. It also involves the leak in the barrier that has been caused by the puncturing of the small deep mine or test hole, wherever this may have been when it was first put in, there is water has come from that.

"But the basis why we feel that this operation is causing pollution to the stream is because the main receiving tributary on this area has doubled in its acidity over what it was when we run our

nowhere else in the record is there mention of "the leak in the barrier that has been caused by the puncturing of the small deep mine or test hole", and, further, although the acidity of the main receiving tributary of the area may well have doubled since the mining operations began, the entire adjudication of the Board deals exclusively with the Kiser spring.

In addition, no dye tests were taken during this investigation although, incidentally, such tests were suggested by Howard W. Warnick (R. 84a), one of A. P. Weaver's witnesses. We are by no means certain of the efficacy of dye tests to this situation or even if such tests are still possible, but it would seem that traces of dye might have surfaced in the Kiser spring had dye been placed, at different times, for example, in the open pit, at the discharge pipes near Route 322, and at the exploratory hole five yards to the south of the spring. This may well have yielded conclusive evidence and made unnecessary the bulk of speculative testimony which comprises much of the record.

These are observations only since it is clear that judicial discretion may not be substituted for administrative discretion even if the reviewing court might have a different opinion or might have reached a different conclusion in regard to the action taken by the administrative agency. *Blumenschein v. Pittsburgh Housing Authority,* 379 Pa. 566, 572-573, 109 A. 2d 331, 334-335 (1954).

---

original investigation, and these samples have already been put into the record. The one prior to the mining had a minus 54 alkalinity and after mining it has, on our last sample, it has a minus alkalinity of 104. This is just about double what the original sample was.

"These are our reasons for feeling that this operation is polluting the waters of the Commonwealth."

[6] We note also that Ralph Garrison stated, "I haven't drawn a conclusion" as to the origin of the Kiser spring water (R. 112a).

"We feel the Board should be afforded an opportunity to remedy these defects. This may be done by reopening the case, receiving new testimony and basing its findings and conclusions upon substantial, legally competent and credible testimony." *Sanitary Water Board v. Stinard, supra,* at 27.

"Where the administrative body has made invalid or inadequate findings or has not afforded a fair hearing, the court granting judicial review can and should remand the case to the administrative body 'for further proceedings to the end that valid and essential findings may be made.' " *Pennsylvania State Athletic Commission v. Bratton,* 177 Pa. Superior Ct. 598, 606, 112 A. 2d 422, 425 (1955).

This case, therefore, is remanded to the Sanitary Water Board for action not inconsistent with this opinion.