Stephen Luchansky, Appellant, *v.* James D. Barger, Commissioner, Pennsylvania State Police, Appellee.

Metro Kardash, Appellant, *v.* James D. Barger, Commissioner, Pennsylvania State Police, Appellee.

Cpl. Curtis W. Guyette, Appellant, *v.* James D. Barger, Commissioner, Pennsylvania State Police, Appellee.

Argued February 4, 1974, before Judges Crumlish, Jr., Kramer, Wilkinson, Jr., Mencer, Rogers and Blatt. President Judge Bowman did not participate.

*Wallace C. Worth, Jr.,* with him *Worth and O'Hara,* for appellant, Luchansky.

*Paul C. Vangrossi,* with him *Vangrossi and Recchuiti,* for appellant, Kardash.

*Andrew M. Pipa, Jr.,* for appellant, Guyette.

*Marc Kapustin,* Deputy Attorney General, with him *Benjamin Lerner,* Deputy Attorney General, *Andrew Smyser,* Deputy Attorney General, and *Israel Packel,* Attorney General, for appellee.

OPINION BY JUDGE ROGERS, June 18, 1974:

Lieutenant Stephen J. Luchansky, Corporal Curtis W. Guyette and Corporal Metro Kardash, members of the Pennsylvania State Police, here appeal from the action of the Commissioner of the Pennsylvania State Police, dismissing them from the service. The Commissioner's action was taken after a trial of the appellants by a court-martial and a recommendation of the Court-Martial Board that the appellants be dismissed.

The appellants were jointly charged with violations of regulations promulgated by the Commissioner of the State Police and were tried together by the Court-Martial Board. We consolidated their appeals for argument and disposition hereby.

The charges upon which the defendants were tried, of which the court-martial found them to be guilty and on which their dismissals by the Commissioner were based, were:

"CHARGE 1 MAJOR VIOLATION OF CODE OF CONDUCT.

"Lieutenant Stephen J. Luchansky, Corporal Curtis W. Guyette, and Corporal Metro Kardash are charged with violation of Field Regulation FR 1-2, paragraph 2.08 A and C.

"This charge results from the actions of Lieutenant Stephen J. Luchansky, Corporal Curtis W. Guyette, and Corporal Metro Kardash which are set forth in the following specifications.

"Specification 1 In that Lieutenant Stephen J. Luchansky, Corporal Curtis W. Guyette, and Corporal Metro Kardash did on or about November 27, 1972, install devices for the purpose of overhearing or recording communications passing through telephones or telephone lines in Rooms 208, 213, and 214 of the George Washington Motor Lodge, King of Prussia, Upper Merion Township, Montgomery County, Pennsylvania. Said Rooms 208, 213, and 214 occupied at the time by State Police Officers assigned to the Pennsylvania Crime Commission.

"This action in violation of State Police directive, Special Order 67-29, dated February 23, 1967, entitled 'Interception of Telecommunications.' A true copy of which is attached hereto.

"This to the prejudice of the good order of the Pennsylvania State Police in King of Prussia, Upper Merion Township, Montgomery County, Pennsylvania, on or about November 27, 1972, in violation of provisions of Field Regulation FR 1-2, paragraph 2.08 A and C.

"CHARGE 2 MAJOR VIOLATION OF CODE OF CONDUCT.

"Lieutenant Stephen J. Luchansky, Corporal Curtis W. Guyette, and Corporal Metro Kardash are

charged with violation of Field Regulation FR 1-2, paragraph 2.22 A.

"This charge results from the actions of Lieutenant Stephen J. Luchansky, Corporal Curtis W. Guyette, and Corporal Metro Kardash which are set forth in the following specifications.

"Specification 1 In that Lieutenant Stephen J. Luchansky, Corporal Curtis W. Guyette, and Corporal Metro Kardash did on or about November 27, 1972, secrete themselves in Rooms 175 and 182 of the George Washington Motor Lodge, using fictitious names, and did install devices on the telephone wires connected with telephones situated in Rooms 208, 213, and 214, occupied by a State Police Unit assigned to investigate corruption in the City of Philadelphia, for the intended purpose of interference with the activities and operation of said State Police Unit.

"This to the prejudice of the good order of the Pennsylvania State Police on or about November 27, 1972, at King of Prussia, Upper Merion Township, Montgomery County, Pennsylvania, and in violation of provisions of Field Regulations FR 1-2, paragraph 2.22 A."

Special Order 67-29, dated February 23, 1967, referred to in Specification 1, Charge 1, is as follows:

"FROM: Commissioner

"TO: Troop Commanders, Substation Commanders, and Bureau Directors.

"SUBJECT: Interception of Telecommunications.

"1. We call to the attention of all personnel the prohibitions relating to the use of electronic devices for the interception of telecommunications. No member of the Pennsylvania State Police shall use, or permit the use of any device(s) for the interception and/or recording of telecommunications between any other parties when such use, or permission to use, is

contrary to either Statutory Law or Opinions of the United States and Commonwealth Courts.

"2. Evidence disclosing willful departure from this order will lead to prosecution in the Courts of the Commonwealth and disciplinary measures by the Force."

Paragraphs 2.08 A & C of Regulations FR 1-2 which the appellants are accused of violating in Charge 1, are as follows:

"A. Lawful Order: A Member shall promptly obey and execute any and all lawful orders emanating from a superior officer. A 'Lawful Order' is any order in keeping with the performance of any duty, issued either verbally or written over the signature of the Commissioner, Bureau Director, Troop Commander, or superior officer; prescribed by the various manuals, regulations, or directives of the Force; necessary for the preservation of good order, efficiency, or proper discipline of the Force and its Members.

"C. Responsibility: A Member shall be held responsible for the proper performance of all duties assigned to him and for strict adherence to the rules, regulations, manuals, and directives promulgated by the Department. Ignorance of the rules, regulations, and directives shall not be considered as an excuse or justification for any violation of such by a Member. A Member shall be responsible for his own acts and he shall not attempt to shift the burden of responsibility for executing or failing to execute a lawful order or police duty."

Field Regulation FR 1-2, paragraph 2.22 A which the appellants are accused of violating in Charge 2, is as follows:

"A. Interference with Cases Assigned to other Members: A Member shall not interfere with cases assigned to other Members for investigation without

the consent of the assignee, except by order of a superior officer; nor shall he interfere with the operation of any Division, Bureau, Section, or Unit."

After a trial lasting nine days and producing almost 1700 pages of transcript and numerous exhibits, the Court-Martial Board issued the following writing:

"FROM: President, Court Martial Board.

"TO: The Commissioner.

"SUBJECT: Court Martial of Lieutenant Stephen J. Luchansky, Corporal Curtis W. Guyette and Corporal Metro Kardash.

"1. The Court Martial Board appointed to hear testimony in these proceedings submit the following verdict:

### "FINDINGS

"Lieutenant Stephen J. Luchansky: of all specifications and charges: Guilty.

"Corporal Curtis W. Guyette: of all specifications and charges: Guilty.

"Corporal Metro Kardash: of all specifications and charges: Guilty.

"2. It is the recommendation that the defendants, Lieutenant Stephen J. Luchansky, Corporal Curtis W. Guyette and Corporal Metro Kardash be dismissed from the force.

"3. These findings and recommendations were by unanimous decision of the board members."

The Order of the Commissioner here appealed from is in full as follows:

"FROM: Commissioner.

"TO: Special Distribution.

"SUBJECT: Court-Martial—Final Disposition.

"1. The Court-Martial Board appointed to hear testimony in these proceedings has returned the following verdict:

"FINDINGS

"Of all the Specifications and Charges: Guilty.

"2. The recommendation of the Board that the defendants, Lieutenant Stephen J. Luchansky, Corporal Curtis W. Guyette, and Corporal Metro Kardash, be dismissed has been reviewed and is upheld by the Commissioner.

"3. Effective midnight, April 23, 1973, Lieutenant Stephen J. Luchansky, Corporal Curtis W. Guyette, and Corporal Metro Kardash are hereby dismissed from the service of the Pennsylvania State Police."

The statutory provisions relating to the dismissal of members of the State Police are found at Section 711 of the Administrative Code of 1929, Act of April 9, 1929, P. L. 177, *as amended*, 71 P.S. §251 (Supp. 1973-1974). The statutory scheme is as follows:

Before any member of the State Police may be dismissed he must be furnished with a detailed written statement of the charges against him and a notice of the time and place where he may be heard before a Court-Martial Board consisting of three commissioned officers appointed by the Commissioner; after hearing the charges and all witnesses the Court-Martial Board is required to determine whether or not the charges have been sustained and whether the evidence substantiates the charges, and, in accordance with such determination, to recommend the discharge, demotion or refusal of reenlistment of the accused; the Commissioner is required to review the records of the trial and to act upon them; and finally, the Commissioner may, in his discretion, follow or disregard the recommendations of the Board. The appeal of an enlisted member aggrieved by the Commissioner's action is to be taken to the Commonwealth Court in "accordance with the provisions of the Act of June 4, 1945 (P. L. 1388) and its amendments, known as the 'Administrative Agency Law.'" [71 P.S. §1710.1 et seq.]

We must first consider the manner in which we are required by the law to review the Commissioner's action and the record below. As the quoted "verdict" of the Court-Martial Board and the order of the Commissioner demonstrate, we have before us no detailed findings of fact but only the ultimate finding by the Board that the appellants were guilty of the charges against them and the Commissioner's dismissal action. Section 711(b) of the Administrative Code does not compel detailed findings by the Court-Martial Board. The Administrative Agency Law in accordance with which the appeal from the Commissioner's action is to this Court, on the other hand, requires that "[a]ll adjudications shall be in writing, shall contain findings and the reasons for the adjudication." Act of June 4, 1945, P. L. 1388, §34, 71 P.S. §1710.34.

The instant cases were tried by both sides and the Court-Martial Board exactly as a criminal case, including motions for and preliminary hearings to suppress evidence as unconstitutionally obtained and an array of character witnesses for one of the appellants. Not surprisingly therefore, the appellee's brief argues that it is our duty merely to test the sufficiency of the evidence as would an appellate court on an appeal of the defendant after a guilty verdict in a criminal case. This test is whether, accepting as true all the evidence and all reasonable inferences therefrom, upon which, if believed, the jury could properly base its verdict, such evidence is sufficient in law to prove beyond a reasonable doubt that the defendant is guilty of the crime of which he has been convicted. *Commonwealth v. Pierce*, 446 Pa. 479, 288 A. 2d 807 (1972). A corollary of the rule requires the appellate court to ignore claims and contentions of the defendant based upon the testimony of his witnesses. *Commonwealth v. Phillips*, 372 Pa. 223, 93 A. 2d 455 (1953). We have concluded that this is not how we should review this case.

Despite the trappings of a criminal case with which State Police Court-Martial proceedings are invested by the Commissioner's regulations, the cause remains administrative in nature; it is simply the means by which a possible personnel action affecting the member of the Force charged with wrongdoing is determined. As the appeal to us is taken in accordance with the Administrative Agency Law, our review must be as that Act requires. We must therefore determine whether the findings of appellants' guilt are supported by substantial evidence. Act of June 4, 1945, P. L. 1388, §44, 71 P.S. §1710.44.

"Substantial evidence is more than a scintilla, and must do more than create a suspicion of the fact to be established." *N.L.R.B. v. Columbian Enameling and Stamping Co.,* 306 U.S. 292, 300 (1939). In *A. P. Weaver & Sons v. Sanitary Water Board,* 3 Pa. Commonwealth Ct. 499, 505, 284 A. 2d 515, 518 (1971), Judge MENCER writing for this Court quoted with approval Dean Stason's definition of the substantial evidence concept as conferring "finality upon an administrative decision on the facts when, upon an examination of the entire record, the evidence, including the inferences therefrom, is found to be such that a reasonable man, acting reasonably, might have reached the decision. . . ." One of the similarities to criminal process provided by the Commissioner's court-martial procedures effective in this case, was his regulation, since repealed, placing the burden on "the prosecution to prove *beyond a reasonable doubt* . . . (1) That the offense was committed. (2) That the accused committed it. (3) That he had the requisite criminal (or wrongdoing) intent at the time. . . ." (Emphasis supplied.) We are required therefore in this case to enlarge Dean Stason's test to include the requirement that the evidence here be such that a reasonable man, acting reasonably, might have reached the same decision as the

Court-Martial Board and the Commissioner without entertaining a reasonable doubt, that is, without such doubt as would restrain a reasonable man from acting in a matter of importance to himself. *Commonwealth v. Donough,* 377 Pa. 46, 103 A. 2d 694 (1954).

We have examined the vast record of the bitterly contested trial before the court-martial with great care. The following is, we believe, a fair statement of the relevant evidence:

Sometime in late October or early November, 1972, 13 members of the Pennsylvania State Police took up residence at the George Washington Motor Lodge, a motel near the Valley Forge exit of the Pennsylvania Turnpike. These officers had been detached from their regular duties and assigned to the Pennsylvania Crime Commission to assist the Commission in an investigation of alleged corruption of public officials of Philadelphia and in that city's police department. The detail was under the command of Sergeant Matthew E. Hunt. Members of the group here necessary to be mentioned are Trooper Anthony S. Caldonetti and Corporal Charles J. Todd. The detail occupied a row of adjoining rooms numbered consecutively 202 to and including 214. Room 208 seems to have been the detail's office because it is referred to by several of its members as a "command post."

Rooms 204 through 214 are located on the second deck of one of a number of structures containing bedrooms in the George Washington Motor Lodge complex. The structure in question extends in a north-south direction, and the second deck rooms occupied by the officers assigned to the Crime Commission face, and are entered, from the east.

Rooms 175, 178, 181 and 182, also involved herein, are located in the same structure as that occupied by the State Police officers assigned to the Crime Commission but face and are entered from the west. These

rooms are entered from ground level, but the terrain is such that they are not surmounted by a second deck. Their rear walls are therefore at least partially common with the rear walls of some of the rooms in the 202 through 214 series. Hence, room 175 is adjacent to 207, 176 is adjacent to 208, 178 is adjacent to 210, 181 is adjacent to 213, and 182 is adjacent to 214.

Above the ceiling of rooms 175 through 182 is an area known as a crawl space, where ducts, fans and telephone wires serving the rooms are located. Entrance to the crawl space is through removable traps in the ceilings of the bedrooms. The crawl space is interrupted at intervals by fire walls impassible by persons in the crawl space. There is such a fire wall at the location of the wall dividing rooms 178 and 179. Hence, one entering the crawl space from rooms 175, 176 or 178[1] cannot reach the crawl space above rooms 179, 180, 181 and 182 and vice versa. Entrance to the crawl space above rooms 175 through and including 182 can also be gained, with the same limitations because of the fire wall from rooms 207, 208, 209, 210, 211, 212, 213 and 214.

In November, 1972, the appellants were members of the Pennsylvania State Police assigned to the Special Investigation Division of the Bureau of Inspection and Special Investigation, with offices in Harrisburg. Corporal Guyette had been ordered by the Commissioner of the State Police, Colonel Rocco P. Urella, to go to the King of Prussia area during the latter part of November, 1972, to check on the "sobriety and propriety" of the State Police officers attached to the Crime Commission. Among other duties in this connection, Corporal Guyette was assigned to investigate Trooper Caldonetti "concerning an incident that occurred on October 5, 1972, in Philadelphia."

---

[1] Room 177, uniquely apparently, has no trap door.

The appellant, Corporal Kardash, signed a guest registration card for room 175 of the George Washington Motor Lodge on November 23, 1972, and paid for the room for one day. The name written on the guest registration card by Corporal Kardash was Frank Sopka, a fictitious name. There is no direct evidence that Corporal Kardash occupied room 175 on that date. On November 26, 1972, Corporal Guyette, using the fictitious name Stanley Knotts, executed a registration card of the George Washington Motor Lodge for room 175 and paid five days rent in advance.

On November 20, 1972,[2] Deborah Wolfe, a maid at the Motor Lodge, talked to a person whom, on the trial date of March 21, 1973, she identified as Corporal Guyette. This person, she testified, was standing at the door of room 182 and told her that he did not want room service but that she should not tell anyone this. Miss Wolfe also testified that at some unspecified time during the daylight hours of November 27, 1972, she talked to a man whom she again identified at the trial as Corporal Guyette, standing outside of room 175 and who, she stated, asked her for towels and a "Don't Disturb" sign.

There is no evidence in the record that Corporal Guyette, or either of the other appellants, ever registered for any room other than room 175. There is no evidence that appellants Lieutenant Luchansky and Corporal Kardash were ever in or near room 182. There is no evidence of the registration for any of the rooms 176 through 182 at any time pertinent to this case. Except for evidence that on one day, November 27, 1972, room 176 was occupied by one or more women with small children, there is no evidence of who may have occupied rooms 176, 178, 179, 180, 181 and 182

---

[2] Miss Wolfe also mentions November 21, 1972, as the date of this occurrence.

during any of the times pertinent to the case. Pass-keys to the rooms were available to 16 to 22 people on the hotel staff.

On November 27, 1972, at about 2:30 p.m., John Benjamin Sherr, maintenance man of the Lodge, went to room 178 to repair a noisy fan motor in the crawl space. When he entered the crawl space with a portable electric light he saw a man descending from the crawl space in the direction of room 175. The man's head was tilted downward as he descended. The distance between Mr. Sherr and the man descending was 20 to 30 feet. At the trial on March 19, 1973, Mr. Sherr identified Lieutenant Luchansky as the person he saw in the crawl space on November 27, 1972. During the course of several investigations of the incident between the date of its occurrence and the trial Mr. Sherr chose from about a dozen photographs placed before him, those of Lieutenant Luchansky and a person named Heidleberg as most resembling the person he saw on November 27, 1972. At another time during these investigations, Mr. Sherr accused an investigating officer, Colonel Charles S. Graci, of being the man in the crawl space. Mr. Sherr states that this identification was made in jest, but it is Colonel Graci's recollection and that of another officer present that it was made seriously. In June, 1973, at a hearing before a District Justice at Norristown, Pennsylvania, Mr. Sherr testified that one John Robert Law, Sr., then under prosecution, was the man he saw in the crawl space on November 27, 1972. This last information is, of course, not in our record. It is included in some detail, with quoted excerpts from notes of testimony of the hearing before the District Justice, in appellant Luchansky's brief. No brief has been filed by the appellee in the case involving Lieutenant Luchansky, and no other communication received from the appellee or his coun-

sel denying or questioning the truth of this later identification.[3]

At 4:00 o'clock on the afternoon of November 27, 1972, as a result of talking with Mr. Sherr, one Thaddeus Raymond Rickards, assistant manager of the Lodge, went to room 175 and knocked on the door. A man whom he identified at the hearing on March 27, 1973, as Lieutenant Luchansky, came to the window, peered through the draperies and assured him that all was well in room 175. During the ensuing investigations, Mr. Rickards described the person to whom he talked as being ugly and pockmarked. He further chose from among a number of photographs, including that of Lieutenant Luchansky, a photograph of one Albert Risdorfer as the person he saw on November 27, 1972, at the window of room 175. At the trial, Mr. Rickards agreed that Lieutenant Luchansky's face is not pockmarked.

After observing the man in the crawl space at 2:30 p.m. on November 27, 1972, Mr. Sherr reported the incident to his supervisors at the Lodge. These gentlemen in turn related it to the State Police officers assigned to the Crime Commission then present. They decided to await the return of Sergeant Hunt, the leader of the detail. Sergeant Hunt did not arrive at the Motor Lodge until about 7:00 o'clock on the evening of November 27, 1972. After it was ascertained by telephone call that the room was unoccupied, Sergeant

---

[3] This seems the appropriate place to mention that from copies of petitions and orders furnished us after argument by counsel for the appellee, at his sole instance, we learn that Corporal Guyette and Corporal Kardash were prosecuted on charges of installing wiretaps and wiretapping growing out of this incident, that they were discharged by a District Justice and that a petition for reprosecution was dismissed by President Judge David E. GROSHENS of the Montgomery County Common Pleas Court, after a review of the record.

Hunt, accompanied by Lodge personnel and several of the men in his command, went to room 175, removed the trap, went into the crawl space and found wires attached to telephone lines. The party then went to rooms 178 and 181 where they again ascended to the crawl space and again saw wires attached to telephone lines. No clothing or other effects of an occupant were found in room 175, except a paper bag containing uneaten food. Sergeant Hunt then assigned one or more men in his command to keep surveilance of room 175 during at least portions of the night of November 27, 1972, and the morning of November 28, 1972. There is no evidence that anyone was seen entering the room.

In the forenoon of November 28, 1972, a Buick sedan automobile was observed by Sergant Hunt's men parked at room 39, some 250 feet distant from room 175 with its rear to the curb line and facing in the direction of room 175. An investigation revealed that this vehicle was registered to one Nicholas Pratko at an address on Roosevelt Boulevard, Philadelphia, which further investigation proved to be the address of Sears store. It was proved at trial that a Buick vehicle registered to Nicholas Pratko and an operator's license in that name had been provided to Corporal Kardash in June, 1972, by order of the Director of the Bureau of Criminal Investigation of the Pennsylvania State Police.

Believing the Buick automobile to be connected with the events of November 27, 1972, Trooper Caldonetti and Corporal Todd stationed themselves in room 39, from the window of which they could see the Buick and the lower portion of the door to room 175. Trooper Caldonetti testified that at about 12:30 p.m. on November 28, 1972, he saw three pairs of legs emerge from room 175. Because of obstructions the legs disappeared from sight for some seconds. He then saw three men approaching the Buick and room 39. He

recognized two of the men, one as Corporal Guyette and the other as Corporal Kardash. The third man he could not identify. One man carried a handbag, another a suit bag, and the third a paper shopping bag. Corporal Guyette was wearing an orange wig with bangs. The three men went to the trunk of the Buick. Trooper Caldonetti did not see them open the trunk nor did he hear the trunk being opened or closed. The three men disappeared from view and were never seen again at the Lodge. Corporal Todd, who was also in room 39, was not as attentive to the window as Trooper Caldonetti because he was occupied with the detail's broken camera, but saw and identified Corporal Guyette and Corporal Kardash. Trooper Caldonetti and Corporal Todd agree that the third man was not Lieutenant Luchansky.

Trooper Caldonetti kept the Buick under surveillance. At about 2:30 o'clock p.m., a Plymouth automobile appeared and stopped near the Buick. Lieutenant Luchansky alighted from the passenger side of the Plymouth and got into the driver's seat of the Buick. Trooper Caldonetti and Sergeant Hunt, who arrived on the scene at about this time, attempted to delay or prevent Lieutenant Luchansky's departure by telling him that the Buick was under investigation and that he, Luchansky, was under arrest. Lieutenant Luchansky simply drove off, the fender of the Buick thrusting Sergeant Hunt aside, apparently without injury.

It was shown in the appellants' case that on the morning of November 28, 1972, in Harrisburg, State Police Commissioner Rocco P. Urella ordered Lieutenant Luchansky to go to the George Washington Motor Lodge, get the Buick and bring it back to Harrisburg. Lieutenant Luchansky admits being at the Lodge for that purpose on that occasion.

Sergeant Hunt requested the Lodge management to obtain the presence of Bell Telephone Company in-

vestigators. These gentlemen, a Mr. Robert Dracup who testified, and his supervisor, a Mr. William R. Schellinger, arrived at about 4:00 o'clock p.m. on November 28, 1972. Mr. Dracup was conducted to the crawl space at rooms 175 and 181. He found what he calls foreign attachments connected to telephone lines. These foreign attachments consist of wires covered with blue and red materials, and clamps. In Mr. Dracup's opinion these foreign attachments were useable for listening in to the telephone conversations being transmitted over the telephone wires to which they were attached, if connected to ear phones or a tape recorder. Mr. Dracup found neither earphones nor any recording device in the crawl space, and testified that there was no evidence that any earphones or other recording device had ever been attached to the foreign attachments he saw. None were ever found on the premises. The only evidence adduced as to the length of time the foreign attachments may have been present in the crawl space is the maintenance man's testimony that he was in the crawl space above room 178 on November 17, 1972, and did not notice any foreign wires at that time.

The Search Warrants, which Sergeant Hunt had sent for after Lieutenant Luchansky left with the Buick at about 2:30 p.m. on November 28, 1972, finally arrived at the Lodge at about 9:00 p.m. on that day. Sergeant Hunt then removed the telephone lines with the foreign attachments from the crawl space above rooms 175 and 181. The telephone lines removed were those to the telephones in rooms 208, 213 and 214.

On behalf of Lieutenant Luchansky, then Commissioner Urella, State Police Lieutenant Herman J. Faiola and Betty Umlauf, a clerk in the State Police office at Harrisburg, testified that Lieutenant Luchansky was in those offices or elsewhere in Harrisburg

from early morning until after the dinner hour on November 27, 1972.

Section 711 of the Administrative Code is penal in nature. It and, by necessary extension, the description by regulation of offenses upon which disciplinary action may be based must be strictly construed. *Pa. State Real Estate Commission v. Keller,* 401 Pa. 454, 165 A. 2d 79 (1960) ; *State Real Estate Commission v. Farkas,* 1 Pa. Commonwealth Ct. 134, 274 A. 2d 238 (1971). The first charge here is that the appellants violated State Police Special Order 67-29. The Order is entitled "Interception of Telecommunications" and provides that "[n]o member of the Pennsylvania State Police shall use, or permit the use of any device(s) for the interrogation and/or recording of the communications." It does not, explicitly at least, as did the Act of July 16, 1957, P. L. 956, 18 P.S. §3742[4] (Supp. 1973-1974), then effective, prohibit the *installation* of devices for overhearing or recording communications. Clearly there is no evidence of the interception of conversations over the wires found in the crawl space above rooms 178 through 182 of the George Washington Motor Lodge. But straining the point by interpreting the Order liberally as prohibiting the installation of wiretapping devices, is the evidence such that a reasonable man might without hesitation find that these appellants committed the forbidden act? We think not.

No earphones or other recording devices were found at the Lodge or in the possession of the appellants, nor were any of the appellants shown to have any training or knowledge concerning the installation of such equipment; the only evidence of when the wires might have been installed is the maintenance man's testimony that he failed to notice any above room 178 on November 17, 1972; Corporals Guyette and Kardash and the un-

---

[4] Now Section 5702 of the Crimes Code, 18 Pa. S. §5702.

known man who departed, seemingly from room 175, at 12:30 p.m. on November 28, 1972, with luggage, were permitted to leave the premises without hindrance; there is no evidence that any of the appellants registered for or occupied any of the rooms accessible to the crawl spaces over rooms 180, 181 and 182, unless a maid's identification of Corporal Guyette as the person at the door of room 182 on November 20, 1972, be accepted as proof that Guyette occupied that room on that day; Corporal Kardash was not proved to have been on the premises before November 28, 1972, unless it is to be inferred from his execution of a registration card for room 175 for November 23, 1972, that he occupied that room on that day; Lieutenant Luchansky was not proved to be at the Lodge before 2:30 p.m. on November 28, 1972, unless we accept the repudiated identification made by one witness and the questionable identification by another and reject the testimony of three persons who saw Luchansky in Harrisburg during all of that day; the crawl space where the foreign attachments were found could be reached from a number of rooms of the Lodge other than room 175; passkeys to all the rooms in the Lodge were available to many persons; and finally, no motive for the appellants to have engaged in wiretapping, as distinguished from mere surveillance of the Crime Commission detail, is even suggested.

Furthermore, the cases against the appellants rest entirely on circumstantial evidence. Hence, the facts and circumstances must not only be consistent with and point to the appellants' guilt of intercepting telephone calls or, under a liberal interpretation of Order 67-29, of installing wiretaps, but they must also be inconsistent with the appellants' innocence. Certainly there was nothing unlawful in Corporals Guyette's and Kardash's presence at the Lodge at any of the times indicated. Corporal Guyette had been ordered to ob-

serve the activities of the Crime Commission detail and all of the appellants were members of a special investigation team of the Pennsylvania State Police. Lieutenant Luchansky's presence at the Lodge on November 28, 1972, was also lawful.

Hence, the Court-Martial Board's finding that the appellants either intercepted telephone calls or installed the wires found on November 27, 1972, rested on suspicion and conjecture, not facts or reasonable inferences therefrom.

Charge Two accuses the appellants of installing wiretaps for the purpose of interfering with the work of the Crime Commission. We note that the regulation on which the charge is based prohibits actual interference, not things done in preparation for interfering. There is no proof that the mere presence of the wires found in the crawl space interfered with or otherwise affected anything the Crime Commission detail did or was attempting to do.

We conclude, therefore, that the findings of guilt by the Court-Martial Board were not supported by substantial evidence and that the Commissioner abused his discretion by dismissing the appellants on this record.

The appellants have raised questions concerning the constitutional validity of the statute providing the means of disciplining members of the State Police, the Commissioner's regulations governing court-martial, and the proceedings in this case. It would overburden this long opinion to fully discuss any of these matters. We decided that the statute was not constitutionally infirm in *Dussia v. Barger*, 10 Pa. Commonwealth Ct. 167, 309 A. 2d 607 (1973). The Commissioner's regulations, contrary to the appellants' contention, provide protection for the Force's employees far beyond those accorded in similar proceedings with which we are familiar, including the right to challenge members of

the court-martial and, as we have mentioned, the imposition upon the appointing authority of the burden to prove the charges beyond a reasonable doubt. The trial itself was fairly conducted. Appellants' objections to the proceedings based upon the absence of the Governor's signature on the face sheet of the Commissioner's Field Regulations filed with the Legislative Reference Bureau[5] are without merit in the light of the Governor's specific approval of the convening of this court-martial to hear these charges of violations of the same regulations.

## ORDER

AND NOW, this 18th day of June, 1974, the order of the Commissioner of State Police made April 23, 1973, dismissing the appellants, Stephen J. Luchansky, Curtis W. Guyette and Metro Kardash from their employment as members of the Pennsylvania State Police is set aside; and the appellants are ordered reinstated to their positions in the service as of the date of their, and each of their, suspensions from duty, with pay from the dates of suspension thereof.

---

[5] See Section 711(a) of the Administrative Code of 1929. Act of April 9, 1929, P. L. 177, *as amended*, 71 P.S. §251 (Supp. 1973-1974).