Gorchov Brothers Real Estate, Appellant, *v.* Commonwealth of Pennsylvania Human Relations Commission, Appellee.

Argued January 11, 1974, before Judges CRUMLISH, JR., MENCER and BLATT, sitting as a panel of three.

Reargued June 5, 1974, before President Judge BOW-MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Stephen J. Cabot*, with him *Stanley A. Uhr, Jack A. Rounick* and *Pechner, Sacks, Dorfman, Rosen & Richardson*, for appellant.

*Frank Finch, III*, Assistant General Counsel, with him *Sanford Kahn*, General Counsel, for appellee.

OPINION BY JUDGE MENCER, June 28, 1974:

The Pennsylvania Human Relations Commission (Commission), after hearing, found that Gorchov Brothers Real Estate (respondent) had engaged in an unlawful discriminatory practice in violation of Section 5(h)(1) of the Pennsylvania Human Relations Act, Act of October 27, 1955, P. L. 744, as amended (Act), 43 P.S. §955(h)(1). Section 5(h)(1) of the Act provides:

"It shall be an unlawful discriminatory practice . . .:

. . . .

"(h)   For any person to:

"(1)   Refuse to sell, lease, finance or otherwise to deny or withhold commercial housing from any per-

son because of the race, color, religious creed, ancestry, sex or national origin of any prospective owner, occupant or user of such commercial housing, or to refuse to lease commercial housing to any person due to use of a guide dog because of the blindness of the user."

Because of its brevity, we set forth the total evidence offered by the Commission:

"MR. WILDSTEIN [attorney for the Commission]: I would like to call as my first witness Gerard Rugel. MR. YAFFE [Chairman of the Commission panel]: State your name and address for the reporter, please? MR. RUGEL: Gerard Rugel, 337 Gribbel Road, Wyncote, Pa.

"GERARD RUGEL was sworn and testified as follows: MR. YAFFE: State your race? A. White. DIRECT EXAMINATION BY MR. WILDSTEIN: Q. On or about February 2nd, 1972, what was your occupation? A. I was employed as Human Relations Representative with the Pennsylvania Human Relations Commission assigned to the Housing Division. Q. In that capacity did you have occasion to visit the offices of the Respondent? A. Yes, I did. Q. Where are those offices located? A. 284 approximately Montgomery Avenue in Bala Cynwyd. Q. Approximately what time was this? A. 10:30. Q. Were you alone? MR. YAFFE: a.m. or p.m.? A. a.m. BY MR. WILDSTEIN: Q. Were you alone or were you accompanied by someone? A. I was alone. Q. What was the purpose of being in that office? A. I was there to ascertain what rentals were available. Q. Did you speak to anyone? A. Yes, I did. Q. Is that person in this room? A. Yes, she is. Q. Would you please point out that person? A. She is sitting at the desk between the two men. Q. Do you know her name? A. No, I think it to be Mrs. Gorchov. MR. YAFFE: Is she the person who is named? MR. ANSTINE [attorney for respondent]: We will stipulate she is Mrs. Gorchov (Spelling) G-o-r-c-h-o-v. BY MR. WILD-

STEIN: Q. Can you relate in general the conversation that occurred at that time? A. Yes, I told her I was interested in an apartment or house, one or two bedrooms, very general, and I was married and I had no children and I asked what she had available. She said, she asked me in what area and I said generally the Main Line area. She said she didn't have anything in the Main Line. I think there was something in an apartment building in Philadelphia right across the line and we discussed the building and she said they had a two-bedroom apartment for $145 plus utilities and that it was, I think it was vacant and could be occupied but needed repairs. She was willing to go halves on a certain amount of renovation and mentioned a figure of $375, something like that, about redoing the apartment, itself. Then I said I wasn't really interested in Philadelphia that I was more interested in staying outside of Philadelphia. She indicated they had no other apartments available so I thanked her and left. Q. Was there any interruptions during that time? A. Not that I remember. Q. About how long did that take? A. I'd say 10 minutes, more or less. Q. I have no further questions.

"CROSS-EXAMINATION BY MR. ANSTINE: Q. Mr. Rugel, was anyone else in the office that morning? A. I don't recall. Q. Is there a reason why you did not prefer to locate in Philadelphia? A. Well we were doing testing in the suburbs. The reason is because I didn't want the apartment. Q. You didn't want the apartment. Did you go to look at that apartment? A. No, I didn't. Q. I have no further questions.

"MR. WILDSTEIN: I would like to call Margaret Mitchell. MR. YAFFE: State your full name and address? MRS. MITCHELL: Margaret Montgomery Mitchell, 7615 Thouron Avenue, Philadelphia.

"MARGARET MONTGOMERY MITCHELL was sworn and testified as follows: DIRECT EXAMINATION BY MR.

WILDSTEIN: "Q. Would you state your race for the record, please? A. Black. Q. On or about February 2nd, 1972, what was your occupation? A. I was Field Investigator for the Pennsylvania Human Relations Commission, Housing Division. Q. Did you have any occasion at that time to visit the offices of the respondent? A. Yes, I did. Q. Where are the offices located? A. On Montgomery Avenue. Q. Approximately what time did you visit these offices? A. 10:40. Q. What was that in relationship to Mr. Rugel's visit? A. About 10 minutes after he came out. MR. YAFFE: a.m. or p.m.? A. a.m. BY MR. WILDSTEIN: Q. Were you alone when you went into the office? A. Yes. Q. What was the purpose of your being in that office? A. To find out if there were any available rentals. Q. Did you speak to anyone? A. Yes, I did. Q. Is that person in this room? A. Yes, Mrs. Gorchov. Q. Did she identify herself to you? A. Yes, she did. Q. Can you relate generally the conversation that ensued? A. Yes, I asked if there were any available rentals and she stated she hadn't any apartments available. I asked if she had any type of rentals and she said she hadn't any and hadn't had any for quite some time and I said, "Can I leave my name and number?" She said, "really it wouldn't be necessary." They never had any available rentals and for me to consult the newspaper. I thanked her and left. Q. Was there any interruptions during the time you were there? A. No. Q. Approximately how long did that take? A. A very short time, maybe a minute I was in and out. Q. No further questions.

"MR. YAFFE: Cross-examine. MR. ANSTINE: No questions. MR. YAFFE: Thank you. Is that the case? MR. WILDSTEIN: Yes, it is."

Although we can consider the entire record and are not limited to the evidence offered by the Commission, this rule of review is of little benefit to the Com-

mission since here the evidence offered by the respondent indicated that the apartment mentioned to Mr. Rugel had been vacated by a black woman, was promised to a black man the day before Mr. Rugel's inquiry,[1] and further, that Mrs. Gorchov had been informed of this commitment of the apartment to Mr. Ellis during the period between Mr. Rugel's inquiry and the inquiry of Mrs. Mitchell. Therefore, this evidence would tend to support a finding that the information given Mrs. Mitchell was correct and that the information given Mr. Rugel was in error. More importantly, it would tend to establish that there was no available apartment for rent when Mrs. Mitchell inquired and that Mr. Rugel had been harmlessly misled concerning the availability of the apartment since his testimony was that he had informed the respondent that he "wasn't really interested in Philadelphia" and admitted on cross-examination that he "didn't want the apartment."

We conclude that this case is controlled by our earlier decision in *Tomlinson Agency v. Pennsylvania Human Relations Commission*, 11 Pa. Commonwealth Ct. 227, 312 A. 2d 118 (1973).

In *Tomlinson* we held that the failure to advise a black person of the availability for rental of a one-level frame house was not, without additional supportive evidence, sufficient to sustain a finding by the Commission that a real estate rental agency had committed an affirmative act of discrimination.

Here the record is completely void of evidence that any apartment was available at the time Mrs. Mitchell was informed that apartments were not available. Respondent's evidence indicates that the only apartment mentioned to Mr. Rugel, at an earlier time, was in fact not available. The assertion of availability of an apart-

---

[1] The written lease agreement with Mr. Craig Ellis, a black man, was entered into by respondent on February 4, 1972, two days after Mr. Rugel's and Mrs. Mitchell's inquiries.

ment at an earlier time to Mr. Rugel is not sufficient, without supportive evidence, to establish the availability of the apartment at the time of Mrs. Mitchell's inquiry. *Tomlinson Agency v. Pennsylvania Human Relations Commission, supra.*

We recognize that our review is limited to a determination of whether the Commission's adjudication is in accordance with law or whether any finding of fact made in support of its adjudication is not sustained by substantial evidence. *Wilkinsburg School District v. Human Relations Commission,* 6 Pa. Commonwealth Ct. 378, 295 A. 2d 609 (1972); *A. P. Weaver and Sons v. Sanitary Water Board,* 3 Pa. Commonwealth Ct. 499, 284 A. 2d 515 (1971).

The evidence in this record will support neither the necessary findings of a discriminatory practice basic to the charge of the complaint nor the ultimate conclusion of a violation of Section 5(h)(1) of the Act. *See St. Andrews Development Co. Inc. v. Pennsylvania Human Relations Commission,* 10 Pa. Commonwealth Ct. 123, 308 A. 2d 623 (1973); *Marhoefer v. Human Relations Commission,* 4 Pa. Commonwealth Ct. 242, 285 A. 2d 547 (1971); *Pennsylvania Human Relations Commission v. Altman,* 87 Dauph. 227, 42 Pa. D. & C. 2d 317 (1967).

Since the Commission has failed to meet its burden of proof, we enter the following

## Order

AND Now, this 28th day of June, 1974, the order of the Pennsylvania Human Relations Commission, dated June 20, 1973 and pertaining to Gorchov Brothers Real Estate, is hereby reversed.

Judges Rogers and Blatt concur in the result.